IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
                          EASTERN DIVISION

UNITED STATES OF AMERICA            )   Case No. 25 CR 637
                                    )
        v.                          )
                                    )
                                    )
JUAN ESPINOZA MARTINEZ,             )   Chicago, Illinois
                                    )   January 21, 2026
                Defendant.          )   9:17 a.m.


                              VOLUME 1
              TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
              BEFORE THE HONORABLE JOAN H. LEFKOW

APPEARANCES:

For the Government:     HONORABLE ANDREW S. BOUTROS
                        UNITED STATES ATTORNEY
                        BY:  MR. MINJE SHIN
                             MR. JASON A. YONAN
                        Assistant United States Attorneys
                        219 South Dearborn Street
                        Chicago, Illinois 60604


For the Defendant:      BEDI & SINGER, LLP
                        BY:  MR. JONATHAN S. BEDI
                             MS. DENA M. SINGER
                        53 West Jackson Boulevard, Suite 1101
                        Chicago, Illinois 60604


Court Reporter:         NANCY L. BISTANY, CSR, RPR, FCRR
                        Official Court Reporter
                        219 S. Dearborn Street, Room 1706
                        Chicago, Illinois 60604
                        (312) 435-7626
                        nancy_bistany@ilnd.uscourts.gov


                    *    *    *    *    *

                PROCEEDINGS REPORTED BY STENOTYPE
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; defendant present; jury out:)

THE CLERK:  All rise.  Calling Case 25 CR 637, USA versus Juan Espinoza Martinez.

State appearances for the record.

MR. SHIN:  Good morning, Your Honor.

Minje Shin for the United States, joined by Jason Yonan and Special Agents Donald Adams and Chris Perugini with Homeland Security at counsel's table.

THE COURT:  Good morning.

MR. BEDI:  Good morning, Your Honor.

My name is Jonathan Bedi.  Along with Dena Singer, we represent Juan Espinoza Martinez, who is sitting at counsel table.

THE COURT:  Good morning, Mr. Martinez.

MS. SINGER:  Good morning, Your Honor.

THE COURT:  Mr. Espinoza Martinez.  Pardon me.

Okay.  I understand we have a preliminary matter.

MS. SINGER:  Yes, Your Honor.  There are -- sorry.

There are two exhibits that we wanted to raise with the Court that we have -- the defense has further objections to.

Judge, the first is what's now being labeled as Government Exhibit 603.  I don't know if Your Honor has that, so I can bring a copy up.

THE COURT: I don't have it in front of me right now. I would have to look for it.

MR. SHIN: I have an extra copy for you, Judge.

MS. SINGER: Thank you.

MR. SHIN: May I approach?

THE COURT: Yes. Thank you.

(Tendering document.)

THE COURT: First let me ask, is this something that can wait for a break, because we're now -- I guess we don't have all the jury yet. We have a couple missing, so go ahead.

MS. SINGER: Okay. It can if -- I don't think these are being asked to be used in opening, but if we do have some time, Judge.

Government Exhibit 603 is what I was going to address first. At the time when we were going back and forth with exhibits, Your Honor, the defense did not realize that the government was trying to use this Exhibit 603. I don't think this was one that was previously sent to the Court, as it's my understanding is that the government sent to the Court exhibits that were kind of objected to.

But Government Exhibit 603 is a two-page document, again, referencing -- it's from an extraction from an iOS iMessage on the second page of it, Your Honor.

THE COURT: Is it a screenshot or what?

MS. SINGER: It seems to be.

THE COURT: Well, let's start with foundation and relevance.

MR. YONAN: Sure, Your Honor. This is a video that was sent. The government is not planning to play the video. This is a video that the defendant sent, and it appears to have been a -- a text message he sent with his video.

The relevance, Your Honor, is it goes to the defendant's motive. He is monitoring the immigration situation. He's monitoring the resistance to the immigration -- immigration operation. He's sending around this video, which shows his knowledge of the operation and that gang members are threatening ICE.

I think that's relevant to his ultimate motive in sending the solicitation in this case, Your Honor. So I do think it's relevant. It's a video the defendant sent. We are not sending -- we are not intending to play the video, but the fact that he sent the message is relevant evidence.

THE COURT: Well, it's -- I have let in some limited amount of his statement that the Kings are up on ICE or something like that. So is this in the same category?

MS. SINGER: Well, Judge, this seems, first of all, from -- the date on this is September 11th, so we're approximately -- I don't know -- three weeks-ish before the date of the indictment.

And Your Honor has also previously ruled about this

kind of concept of adopting other people's words.

And I don't -- this statement that is on page 2, it doesn't seem, based on the government's argument -- and I don't want to put words in their mouth -- but that who wrote that statement and if it -- where that came from. And if this whole thing was just forwarded on, it goes right to a previous ruling that Your Honor has already made regarding the adopting of other people's words about gang evidence. And Your Honor really has already made these rulings.

And so I think it really has been already ruled to not come in, but it seems that the government doesn't see it that way, and so I wanted to raise this.

THE COURT: Okay. So what is the relevance if it happened three weeks before? What does it -- other evidence do you tie this to?

MR. YONAN: The relevance, that is a close enough temporal relationship, Your Honor, to the date of the solicitation, because it's, again, showing that he's monitoring the immigration situation.

It can be argued that this shows that he's against the immigration operations, which is the lead-up to the solicitation when he receives the information and sends it on, but it is -- it is in September, so -- and the solicitation was in early October.

THE COURT: Right. Well, I mean, I think I could go

either way, but I've already -- I don't understand why this wasn't fronted to me already. And then it does seem within, you know, the ruling that this is not a gang case. So I'll sustain the objection.

Is that it?

MS. SINGER: Give us a moment, Judge.

(Counsel conferring.)

MS. SINGER: That's all, Judge.

THE COURT: Is there anything else we need to cover?

MR. SHIN: A couple other preliminary items, Your Honor.

We just wanted to put on the record before the jury comes in, a colleague in our office, another AUSA, Diane MacArthur, who was in the gallery yesterday but not part of the trial team, she informed us that during a break she was in the elevator with one of the selected jurors.

Our understanding is there was no discussion about substance of the case. It was just a very brief discussion about where everybody was headed and what direction they were going.

She disclosed that to us. We -- she also disclosed it to the defense. I don't think they have any issue or objection with what happened, but we just wanted to raise that before the Court.

MS. SINGER: That's correct, Judge. It may help, if

the Court wouldn't mind, if we could maybe instruct the jurors to use one elevator and then the parties -- you know, the government, the defense could use maybe the south elevator.

THE COURT: Right.

MS. SINGER: And that way we might be able to limit any more --

THE COURT: Yeah, I overlooked that. But, yes, that will be on my agenda to try to remember to do that.

MS. SINGER: Thank you, Judge.

THE COURT: So I -- yes.

MR. SHIN: And I -- I'm sorry to interrupt, Your Honor. One just remaining item.

Your Honor, we anticipate that the source of information will be the government's first witness.

THE COURT: Okay.

MR. SHIN: We would be seeking a ruling from the Court that there would be no courtroom sketches made of the witness.

Your Honor ruled on the government's motion about the use of his full name. He'll be here testifying in open court. His full name will be used.

We do think, though, that if there is a sketch of his likeness out there -- you know, I think we don't have to go over sort of what was mentioned in the motion -- but I think there might be effects outside of this case.

So we would seek a ruling that there would be no

courtroom sketches of that particular witness.

THE COURT: Okay.

MS. SINGER: I don't take a position, Judge.

THE COURT: All right. So our artist back here -- that's a compliment to the artist, right? He could make a recognizable depiction of the man.

So yes. All right. No sketches of this witness.

MR. SHIN: Thank you, Your Honor. Nothing further from the government.

THE COURT: All right. So I'm told we're still waiting for one juror. Any updates?

THE CLERK: I can go check. I'll go check.

THE COURT: All right.

(Brief pause.)

THE COURT: All right. Who is doing the opening for the government?

MR. SHIN: I'll be opening for the government, Your Honor.

THE COURT: All right. And for the defense?

MR. BEDI: I will be, Your Honor.

THE COURT: Okay.

(Brief pause.)

THE CLERK: All rise.

(Jury in.)

THE COURT: You may be seated. Good morning.

THE JURY: Good morning.

THE COURT: Thank you for coming out on again another wintery day, a little warmer than yesterday.

We are about to start the trial with opening statements, and this is a time when the attorneys have an opportunity to give you a roadmap about what they expect the evidence will show in the trial, and it will help you follow the evidence as you -- as it is received.

Remember, as I told before, that what the lawyers say is not evidence. So if any time you believe there is an inconsistency between the evidence and what a lawyer has said, you should rely on your memory of the evidence. With that, however, it is a very helpful time to frame the discussion in the courtroom.

We'll start with Mr. Shin for the United States.

MR. SHIN: Thank you, Your Honor.

May I publish to the jurors, please?

THE COURT: Yes.

MR. SHIN: And am I on?

THE COURT: I think so.

OPENING STATEMENT ON BEHALF OF THE GOVERNMENT

MR. SHIN: "10k if you take him down." Words that speak for themselves. Words that are more than just words. They are a solicitation to murder. Words communicating a specific incentive, encouraging a specific action to be taken

Opening - government

10

against a specific individual.

Last October the defendant, Juan Espinoza Martinez, typed out and sent these words at a time when immigration officers were on the streets of Chicago and the surrounding suburbs operating an immigration enforcement surge.

And that operation hit the defendant close to home in his neighborhood, Little Village. And that operation was a threat to arrest, detain, and deport members of that community. And so when the defendant sent those words, he made sure to attach a photograph of the man he wanted to be killed, the man placed in charge of leading that immigration enforcement operation, Border Patrol Chief Gregory Bovino.

And he sent a solicitation for his murder not once but twice from Snapchat using his account to two different recipients that he thought were like-minded. But what the defendant did not count on was that one of those recipients, a man named Adrian Jimenez, who will testify in this case, upon receiving that message did take immediate action but just not the one that the defendant intended. Because unbeknownst to the defendant, Mr. Jimenez had a history of providing information to law enforcement.

And so when he received that message from the defendant, he acted immediately; and he knew who to contact, an agent at Homeland Securities that he had previously known, not because he was looking for anything in return, not because

anybody told him to do it.  Because he saw the defendant's words, and those words spoke for themselves.

And when Mr. Jimenez acted, he also preserved those words, because those words were sent to Mr. Jimenez over Snapchat, and Mr. Jimenez knew that that meant those words would soon disappear into the night.

But because Mr. Jimenez preserved those words, those words, including the surrounding words, photographs, and symbols that provide context for those words and provide meaning to those words, will become evidence in this case as Government Exhibit 201.

These are photographs, words, and symbols that the defendant sent to Mr. Jimenez using his Snapchat account.  A photograph of Commander Bovino, the words "2k on info cuando lo agarren," which translates to 2k on info when they catch him. "10k if you take him down, LK honor."  Latin -- "LK" standing for the Latin Kings Chicago street gang.

Members of the jury, in that message the defendant did not mince his words, and neither will I.  This case is about the solicitation of someone's murder.  And in this case, that someone is a public official; and in this case, that someone was an immigration enforcement officer who was in Chicago conducting an immigration enforcement operation.

But let me be also be clear about what this case is not about.  This case is not about someone being on trial for

expressing strong, even angry views about immigration enforcement policy. This case is not about someone being on trial because they showed a dislike for Gregory Bovino or anybody else for that matter.

Make no mistake. The evidence in this case will show that what the defendant did was not a joke, was not him just mouthing off, was not him blowing off steam behind a keyboard, was not political discourse. It was not him just sending an FYI or "I heard this through the grapevine."

What the defendant did was a solicitation of murder. And no matter what the reasons are, murder is murder, and solicitation is a crime. And that is why in this case the defendant is charged with using a facility of interstate commerce, his phone, his Snapchat accounts, in furtherance of a murder-for-hire. And the government bears the burden of proving that charge to you beyond a reasonable doubt.

And the central issue in this case is whether the defendant sent that solicitation with the intent that a murder be committed. And the evidence in this case will prove to you beyond a reasonable doubt that he did have that intent, that he sent that solicitation communicating a specific incentive for a specific action against a specific individual, because he wanted someone to kill him.

And that is because in this case the evidence will consist primarily of the defendant's own words that will reveal

to you what was going on in his mind when he sent those words, the defendant's words in the form of his statements in a recorded interview with law enforcement and his messages sent through text messages, Snapchat, and Facebook.

You will hear the defendant's own words from portions of a recorded interview and specifically portions of that interview where he was confronted with the words that he sent to the defendant. And when he is confronted with those words, you will see for yourself that he does not say that this was something that he made up. He will not say that this was some elaborate hoax.

He will admit that he sent those words. He will admit that he sent those words using his Snapchat account. He will admit that he put LK in reference to the Latin Kings. He will admit that he got the information from the Latin Kings. But the information in that message was real.

And through the defendant's messages that he sent, you will also see the reason for the solicitation, the why. You will see through the defendant's own words what Gregory Bovino's face represented to the defendant. It was a face that he was fixated on in early October 2025 as evidenced by the multiple times he sent the man's photograph through Facebook, Snapchat, and text messages.

And to the defendant, Gregory Bovino was the face of the threat to his community. Immigration enforcement

operation, there was a threat to arrest and detain and deport members of his community, Little Village, and that threat hit him close to home.

And you will also see through the defendant's own words that he was gravely disappointed when members of the community did not show up in force to protect the community against that threat; that is, except for the Kings.

You will see in the defendant's text messages the defendant bragging in early October at around the same time he sent the solicitation to Mr. Jimenez that "they," referring to immigration enforcement officers, "haven't taken none from the vill," Little Village, "and they won't, because Kings on the ass N they scared."

The Kings were on it. The Latin Kings were on him. The Latin Kings offered the defendant a way, and that way was an opportunity for someone to make money if they eliminated the leader of that threat to his community or, as the defendant referred to him in his own words, the top pig.

And the defendant made sure to spread the word about this opportunity to people that he knew. And the defendant simply did not spread that word to Mr. Jimenez. You will see that the defendant sent the same murder solicitation of the same individual to a second recipient on Snapchat using his account, monkey2430.

And it wasn't -- and it wasn't just a copy and paste.

He took the time to type out the words again but in this instance in just a slightly different way. "10k for his head" right underneath a photograph of Commander Bovino, a second solicitation calling for the same murder, the same specific incentive encouraging the same specific action against the same specific individual.

And the rest of this conversation, as you will see in this trial, shows the defendant doubling down, not that this was a joke but that the shit was serious. Quite literally the opposite of a joke.

And to show this recipient how serious the defendant was, later on in the conversation you will see the defendant trying to convince this recipient the merits of what the Latin Kings were offering.

Then you will also see later on in the conversation the defendant taking it a step further and on the following day sending this recipient a photograph of a firearm for sale at a discounted price.

Members of the jury, this case, this investigation all started because the defendant made a choice to use words that crossed a line. That is why we're here. Not because he had vocal opinions on immigration enforcement, not because of his dislike of Gregory Bovino, but because he solicited murder, because he chose to commit a crime. That is why we're here.

Now, at the end of this case, the government will

stand before you again and ask you to return the only verdict consistent with all the evidence you will see and hear, and that is guilty.

MR. BEDI: May I, Judge?

THE COURT: Yes. Mr. Bedi.

OPENING STATEMENT ON BEHALF OF DEFENDANT

MR. BEDI: Juan Martinez is not guilty. He's not guilty because repeating neighborhood gossip is not a federal crime. Repeating neighborhood gossip is not intending to commit a murder. And sharing Facebook posts is not a federal crime.

Before I get into what exactly happened, I'm going to talk about some of the principles that the Judge talked with you about yesterday.

As Juan sits her today, he is presumed innocent. That's a presumption that we all have. That presumption protects us from overeager government officials. It protects us from government officials who want a conviction but have no evidence.

And that's because the burden of proof is on the government. The burden of proof is on these lawyers. They can't stomp Mr. Martinez guilty. They can't just point and say, "Juan, you're guilty." They have to prove it with evidence, with facts. Not their assumptions, not their speculation, not their guesses.

They cannot prove Juan's intent. This case is riddled with doubt. That doubt is reasonable, because the government cannot point to anything that shows Juan's intent.

The government's theory here, if I understand it, is that Juan sent some communication to a friend and his brother and is guilty for solicitation of murder. That's their theory. When you cut through all of their words, that's their theory.

There's no recordings. There's no direct evidence. All they have is their guesses and speculation about what Juan's intent was.

Don't let the title of "U.S. Government" fool you. They are guessing; they are speculating. Repeating neighborhood gossip is not a federal crime. Seeing something on Facebook and sharing it with your friend and your brother is not committing a solicitation for murder.

We heard a lot about who Juan is. Juan is 37 years old. He's a union carpenter. He's lived in the Little Village area of Chicago his entire life. He has three children. He takes them to soccer practice, takes them to their events, goes to school. Never been in trouble. So they want you to think that all of a sudden Juan is out there soliciting murder.

Put everything else aside. Put everything else aside. That raises a reasonable doubt.

Now, the government talked a little bit about the context of what was happening in October in Little Village, and

I think it's important for us to talk about that a little bit.

October in Little Village in 2025 was not like a normal October in Little Village. ICE enforcement was high. Immigration enforcement was high. Some families were hiding.

The neighborhood was on edge. Some parents were afraid when they left and kissed their kids good-bye at school that they would not see them again. Some of those very kids were afraid that they would not see their parents again.

The neighborhood was sharing information about where immigration enforcement was happening. The neighborhood was sharing information about what was occurring. Things were happening fast, too fast for the Sun-Times and the Chicago Tribune to keep up with.

So neighborhoods and neighbors, in an effort of community self-preservation, for lack of a better word, were sharing information about what was going on.

And that's what Juan did. Did he share the gossip? I'm not going to stand here before you and tell you that he didn't share that. But that's what it was. It was gossip. "Did you hear this? This is crazy?" And then he types it out, sees it on Facebook and sends it to his brother. That is not solicitation for murder.

So what happens? Juan hears from multiple people, different accounts, that there's gossip, there's chatter that some people were offering 10K for Bovino. He has no

information that it's true.  He has no obligation to fact check it.  He just sends it off, not because he had any intention of being involved, any intention that Bovino was hurt or killed. Just sharing this information, because sharing Facebook information is not a federal crime.  Resharing neighborhood gossip is not intending to commit a federal crime.

The government talked a little bit about the statements Juan makes to the agent.  Juan is arrested very quickly after these posts.  He's brought into a room, and he's asked questions.  He speaks with them for hours without a lawyer.  He hands over his phone.  They ask to unlock it.  He unlocks it.  They ask to search it.  He lets them search it.

The entire time he's consistent.  "I saw posts.  I heard things.  I shared it.  I didn't intend this to be a threat."  He's, like, "What am I doing here?"

You'll see.  You'll hear from him.  You'll see that that's not someone who is involved in a solicitation for murder.  Someone with that criminal intent doesn't cooperate with the government like that.

He says, "Hey, look it.  Look at anything you want."

The government wishes he said something different, but he was consistent during the entire time.

The government has to prove that he shared those message with the intent to commit -- a murder be committed.

It's not enough that Juan was unhappy with ICE

immigration. A lot of people are unhappy with ICE immigration. It's not enough that he was worried about people being deported, but you can look at his behavior to see what his intention was.

You're not going to hear that he had $10,000. You're going to hear he had less than $20 in his bank account. You're not going to hear that there were bags of money that he was going to give to people. You're not going to see wire transfers.

You're not going to see somebody saying, "Here, pick it up."

You're not going to see him following up on the messages. "Hey, I'm sending this to somebody else unless you take this job. Do you want to take this? Listen, I'm going to my second guy."

You know, like, think about it when you have a leak in your house. You text the plumber. If he's, like, "Oh, I'm too busy," you go to the next guy.

That doesn't happen. There's no discussion of that. You're not going to hear that there's any plans. There's no location scouted. There's no escape route. There's no surveillance. There's no communication saying, "Bovino is here. Now would be a good time to act."

Instead, when he's asked about it by the agents, he says, "I wasn't threatening anybody."

The government doesn't have any of that evidence because he never intended to threaten anybody.  Repeating neighborhood gossip is not trying to commit a murder.

The government is hoping that the 14 of you will hear murder-for-hire, immigration official, and stop and sign the guilty form.

I'm counting on you, Juan is counting on you, to examine the complete lack of evidence that they have about his intent.  And when you do, I am confident that you will sign the only verdict that follows the law, follows the evidence, and that's not guilty.  Thank you.

THE COURT:  All right.  Thank you, counsel.

You may call your first witness, Mr. Shin.

MR. SHIN:  Your Honor, the government calls Adrian Jimenez.

THE COURT:  All right.

(Brief pause.)  (Witness entered courtroom.)

THE COURT:  Good morning.

THE WITNESS:  Good morning, Your Honor.

THE CLERK:  Would you please raise your right hand to be sworn?

You do solemnly swear that all of the statements you are about to make will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

(Witness sworn.)

ADRIAN JIMENEZ, GOVERNMENT'S WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MR. SHIN:

Q.   Good morning, sir.

A.   Good morning.

Q.   Can you please state your name and spell it for the record, first and last name?

A.   First name Adrian, A-d-r-i-a-n.  Last name Jimenez, J-i-m-e-n-e-z.

Q.   Mr. Jimenez, how old are you?

A.   44 years old.

Q.   How long have you lived in Illinois?

A.   Over 30 years.

Q.   Were you born in the United States?

A.   No.

Q.   Where were you born?

A.   Mexico.

Q.   When did you come to the U.S.?

A.   As a child.

Q.   After you came to the U.S., have you lived in Illinois that entire time?

A.   Yes.

Q.   Can you read and write in English?

A.   Yes.

Q.   Can you read and write in Spanish?

A.   So-so.

Q.   Are you a United States citizen?

A.   No.

Q.   Do you currently have legal status?

A.   Yes.

Q.   What is the form of your current legal status?

A.   Permanent residency.

Q.   When did you become a permanent resident?

A.   Around 2017.

Q.   What do you do for a living?

A.   I own a small company, construction.

Q.   How long have you owned that construction business?

A.   This one, about less than a year.

Q.   Sir, if I can ask you to just speak slowly and clearly and into the microphone.

A.   Sorry.

Q.   I'll ask that again.  How long have you been in the construction -- excuse me.

         How long have you owned that construction company?

A.   Less than a year.

Q.   Prior to that, have you always been in the construction business?

A.   Yes.

Q.   In total, approximately how long have you been in the

construction business?

A.   Twenty-something years.

Q.   Prior to testifying here today, did you meet with myself, Mr. Yonan, and the two agents seated at this table multiple times?

A.   Yes.

Q.   Sir, do you know someone named Juan Espinoza Martinez?

A.   Yes.

Q.   Do you see that person in the courtroom today?

A.   Yes.

Q.   Could you point that person out by describing their appearance and the clothes that they are wearing?

A.   Wearing a gray suit, black tie on the -- to my right-hand side.

        MR. SHIN:  Your Honor, may the record reflect that the witness has identified the defendant?

        THE COURT:  Yes.

BY MR. SHIN:

Q.   Sir, how long have you known Juan Espinoza Martinez, the defendant?

A.   Less than a year.

Q.   How is it that you know the defendant?

A.   He reached out to me on Snapchat regarding work.

Q.   Did he reach out to you on Snapchats because he was looking for construction work?

A.   Yes.

Q.   Specifically, was he reaching out to you for work on construction projects that your business had secured?

A.   Yes.

Q.   And when the defendant first reached out to you, that was through Snapchats?

A.   Yes.

Q.   Since then have you used Snapchats to communicate with the defendant?

A.   Yes.

        MR. SHIN:   If I may have the screen just for the witness, please.

BY MR. SHIN:

Q.   Sir, do you see an image up on your screen?

A.   No, I do not.

        I do now.

Q.   Okay.  I'm showing you what's been marked as Government Exhibit 202.  Do you recognize this photograph?

A.   Yes.

Q.   Is this a photograph of a Snapchat user profile taken from your phone?

A.   Yes.

Q.   Whose Snapchat profile is this?

A.   Juan.

Q.   And when you say "Juan," are you referring to the

defendant?

A.   Mr. Espinoza.

MR. SHIN:  Your Honor, the government would move to admit Government Exhibit 202 into evidence.

MS. SINGER:  No objection.

THE COURT:  Okay.  Exhibit 202 is received in evidence.

(Government Exhibit No. 202 was received in evidence.)

MR. SHIN:  May we publish Exhibit 202 to the jury?

THE COURT:  Yes, you may.

MR. SHIN:  Thank you.

BY MR. SHIN:

Q.   Sir, I want to direct your attention to some text on your screen here.  Do you see where it says, "Juan" and then below that "monkey2430"?

A.   Yes.

Q.   What do those two things signify?

A.   His name and his usage name.

Q.   Both of those things, are those associated with Juan's Snapchat user?

A.   Yes.

Q.   And do you also see the image inside of a circle there?

A.   Yes.

Q.   What does that signify?

A.   The post that he made.

Q.   So does that depict a recent post that a particular user made?

A.   Yes.

        MS. SINGER:  Objection, leading.

        THE COURT:  Overruled.

BY MR. SHIN:

Q.   And based on your experience using Snapchats, can that picture be different at any given time?

A.   Yes.

        MR. SHIN:  We can take this down, please.  Thank you.

BY MR. SHIN:

Q.   On October 2nd last year, did you contact agents with Homeland Security Investigations about a Snapchat message you received from the defendant?

A.   Yes.

Q.   Did you take photographs of those messages?

A.   Yes.

Q.   Did you send those photographs to an HSI agent you previously knew?

A.   Yes.

        MR. SHIN:  If I could have the screen just for the witness.

BY MR. SHIN:

Q.   I'm showing you what's been marked as Government Exhibit 201, and then I'm also showing you what's been marked as

Government Exhibit 201-T.

Are these -- is 201 a photograph of that message from the defendant on October 2nd?

A. Yes.

Q. Did you take that photograph?

A. Yes.

Q. And 201-T, is that the same photograph except there is a part of that that is translated from Spanish to English?

A. I'm still seeing the same --

Q. Oh, I'm sorry.

Do you see that now, Government Exhibit 201-T?

A. Yes.

Q. Is that the same photograph except part of it is translated from Spanish to English?

A. Yes.

MR. SHIN: The government would move into evidence Exhibits 201 and 201-T.

MS. SINGER: Nothing based on previous rulings.

THE COURT: The exhibits are received in evidence, 201, 201-T.

(Government Exhibit Nos. 201 and 201-T were received in evidence.)

MR. SHIN: And at this time, Your Honor, the government would like to read into the record a stipulation.

THE COURT: All right.

MR. SHIN: This is stipulation No. 5.

The following exhibits ending in the letter "T" contain true and accurate translations from Spanish to English of the corresponding exhibits:

Exhibit 201 and a translated Exhibit 201-T, Exhibit 204 and the translated Exhibit 204-T, Exhibit 402 and a translated Exhibit 402-T, Exhibit 404 and the translated Exhibit 404-T, Exhibit 601 and a translated Exhibit 601-T, Exhibit 604 and a translated Exhibit 604-T, Exhibit 605 and a translated Exhibit 605-T, Exhibit 607 and a translated Exhibit 607-T, Exhibit 608 and a translated Exhibit 608-T, Exhibit 609 and a translated Exhibit 609-T.

And further, the following transcripts contain true and accurate translations from Spanish to English: 101-2A-TR, 101-2B-TR.

So stipulated?

MS. SINGER: So stipulated.

MR. SHIN: May I publish 201-T to the jury?

THE COURT: Yes.

BY MR. SHIN:

Q. Sir, how long have you used Snapchat?

A. Over a few years.

Q. Are you familiar with the basic features of Snapchat?

A. Yes.

Q. Can you send and receive pictures on Snapchat?

A.   Yes.

Q.   Can you send and receive videos on Snapchats?

A.   Yes.

Q.   Can you use Snapchats to place audio calls?

A.   Yes.

Q.   Are you familiar with disappearing messages on Snapchats?

A.   Yes.

Q.   And based on your experience, how does that work?

A.   If a person sends a message, after one opens it, it disappear.

Q.   Based on your experience using Snapchats, is that one of the main features of Snapchat?

        MS. SINGER:  Objection, outside the scope of his knowledge.

        THE COURT:  Overruled.

        MR. SHIN:  I'll ask it again.

BY MR. SHIN:

Q.   Based on your experience with Snapchat, is that one of the main features of it?

A.   I believe so.

Q.   Based on your experience using Snapchats, if you sent someone something over Snapchats and the recipient took a screenshot of it, would you get notified?

A.   Yes.

Q.   To communicate with someone using Snapchats, do you have to

be connected to either the internet or phone data?

A.   I believe so.

Q.   Sir, do you have two cell phones?

A.   Yes.

Q.   Directing your attention back to Government Exhibit 201-T, did you testify earlier that you took this photograph?

A.   Yes.

Q.   How did you take this photograph?

A.   With my other phone.

Q.   Why did you do that instead of taking a screenshot?

A.   So Juan wouldn't know that I took a screen -- a picture of it.

Q.   On the screen in front of you, do you see a blue line running down the left-hand side of the photograph?

A.   Yes.

Q.   What does the blue line signify?

A.   The person that send it.

Q.   So everything on the screen here, are those things that the defendant sent to you?

A.   Correct.

Q.   Were these things that disappeared?

A.   Yes.

Q.   Did they disappear?

A.   Yes.

Q.   Before they disappeared, did you take this photograph with

your other phone?

A.   Yes.

Q.   Do you recognize the person depicted in the photograph there?

A.   Yes.

Q.   Who do you know that person to be?

A.   I believe the chief of immigration.

Q.   Below the photograph do you see the text that says, "2k on info when they catch him"?

A.   Yes.

Q.   What did you understand those words to mean?

A.   $2,000 when they grab him.

Q.   Directing your attention to the text right underneath that, do you see where it says, "10k if you take him down"?

A.   Yes.

Q.   What did you understand those words to mean?

A.   $10,000 if you kill him.

Q.   And lastly below that, "LK on him," do you see that?

A.   Yes.

Q.   What did you understand those words to mean?

A.   Latin Kings are on him.

Q.   Do you see the three hand symbols inside of that phrase there?

A.   Yes.

Q.   What did you understand those hand symbols to mean?

Jimenez - direct

33

A.   The Latin Kings hand sign.

Q.   After you received this information from the defendant, did you write anything back in response?

A.   Yes.

Q.   What did you write?

A.   I wrote it in Spanish.  I said, "*Y eso qué?*"  (Phonetic)

Q.   And what does that translate to in English?

A.   "What about that?"

Q.   And after that, did the defendant send you anything in response?

A.   He continued I believe a few hours, send me other stuff.

Q.   Did he send you pictures and videos?

A.   Yes.

Q.   Did he also send you additional messages he wrote?

A.   Yes.

          MR. SHIN:  If we can take this down from the jurors, please.  Thank you.

          And if I may show just the witness Government Exhibit 204.

BY MR. SHIN:

Q.   Sir, do you see Government Exhibit 204 on the screen?

A.   Yes.

Q.   And what about Government Exhibit 204-T, do you see that on your screen?

A.   Yes.

Q.   And then lastly, Government Exhibit 205, do you see that on your screen?

A.   Yes.

Q.   Exhibits 204 and 205, are those photographs that you took?

A.   Yes.

Q.   Are they pictures of the continuation of your Snapchat conversation with the defendant?

A.   Yes.

Q.   And Government Exhibit 204-T, was that the same exhibit as 204, just with some translations added to it?

A.   I believe so.

        MR. SHIN:   Okay.   At this time, Your Honor, the government would move Exhibits 204, 204-T, and 205 into evidence.

        MS. SINGER:   Judge, can we take a brief sidebar before?

        THE COURT:   Yes.

        MS. SINGER:   Thank you.

   (Proceedings heard at sidebar on the record:)

        MS. SINGER:   Can you hear me, Judge?

        THE COURT:   Yes.

        MS. SINGER:   Thank you.   Judge, we are asking for a limiting --

        THE COURT:   The white noise is so loud, I can't hear you very well.

MS. SINGER:  We are asking for a limiting instruction at this time be given.  Based on previous rulings, 204 and 204-T have, you know, communication of another individual.

The government has indicated that they are not seeking those for the truth of the matter.  The Court has ruled that is not adoption.  And so we're asking for a limiting instruction since there's hear -- what we say is hearsay.  The government says it's not being offered for the truth of the matter in 204 and 204-T.

THE COURT:  And you want me to say what?

MR. BEDI:  The instruction should be something along the lines of -- of it's in accordance with your ruling that the jury cannot consider other people's words as to be adopted by Juan.

I don't have your ruling in front of me right now, but Your Honor laid it out, I think, very -- much more succinctly than I just did, but I think it should track your ruling.

THE COURT:  Well --

MR. SHIN:  And, Your Honor, the government anticipates eliciting some testimony from the defendant that --

MS. SINGER:  I'm sorry, from the defendant?

MR. SHIN:  I'm sorry.

(Continuing) -- from Mr. Jimenez that at least some of the words that are depicted in the photographs are words that defendant used, but I have no issue with an instruction saying

that words that are not attributed to defendant are not being used for the truth of the matter.

THE COURT: You mean not attributed, meaning spoken by or said by?

MR. SHIN: Spoken by the defendant. Words not spoken by the defendant.

THE COURT: All right.

MS. SINGER: Thank you.

THE COURT: You can end.

(End of sidebar proceedings.)

THE COURT: Just to caution you about this exhibit, the words that the defendant did not communicate on this screen are not to be -- they're not to be considered against the defendant.

All right. If they're not his words, he didn't say it. All right. Okay.

MR. SHIN: Your Honor, just so the record is clear, I move to admit Exhibits 204, 204-T, and 205.

MS. SINGER: Based on previous rulings, no objection.

THE COURT: All right. Those exhibits are received in evidence, 204, 204-T, and 205.

MR. SHIN: Correct.

(Government Exhibit Nos. 204, 204-T, and 205 were received in evidence.)

MR. SHIN: And if I may -- one second. If I may

publish Government Exhibit 204 to the jury?

THE COURT:  You may.

BY MR. SHIN:

Q.  Sir, do you see at the very top of the screen a black box that is cut off?

A.  Yes.

Q.  And was that a video that the defendant sent to you?

MS. SINGER:  Objection, leading.

THE COURT:  Sustained.

BY MR. SHIN:

Q.  Let me show you Government Exhibit 205.  Is this what that black box was?

A.  Yes.

MS. SINGER:  Objection, leading.

THE COURT:  Sustained.

BY MR. SHIN:

Q.  What is Government Exhibit 205?

A.  I believe it was a video.

Q.  Who sent it to you?

A.  Juan.

Q.  Did he send this to you after you asked him:  "And what this"?

A.  Yes.

Q.  Do you see the words:  "Where is my SH brothers at!!  Be on point brothers!!!"?

A.   Yes.

Q.   Is it your understanding that is a caption that the defendant added to this video?

        MS. SINGER:  Objection.

        THE COURT:  Sustained.

BY MR. SHIN:

Q.   I'm showing you now what's been marked as Government Exhibit 204-T.  Underneath the black box, do you see another photograph?

A.   Yes.

Q.   And is that photograph a screenshot of another conversation involving someone named Bby Spooks D27?

A.   I believe so.

Q.   Now, focusing your attention to that screenshotted conversation, do you see some lines bordered -- excuse me -- do you see some text bordered in a red line?

A.   Yes.

Q.   And that -- those red lines are labeled "Me"?

A.   Yes.

Q.   And then do you also see some text bordered in a blue line labeled "Bby"?

A.   Yes.

Q.   Based on the context of the conversation, who did you understand "Me" to be referring to?

A.   Juan.

Q. So starting at the top of the screen here, "Bro we need some ppl pu gw out here. Lets get some guys here bro. Tbh its bs whats goin on." Did I read that correctly?

A. Yes.

Q. And then Bby responds: "We going in a bit."

Did I read that correctly?

A. Yes.

Q. And the defendant responds: "Ill be here cameras are on."

Did I read that correctly?

A. Yes.

Q. Bby responds: "Let one of us be infront with the."

Did I read that correctly so far?

A. Yes.

Q. And then at the end of that sentence there, what is that a picture of?

A. I believe it's a gun, toy gun.

Q. And then the defendant responds "Got u," and Bby responds "Ok." Did I read that correctly?

A. Yes.

THE COURT: All right. It's time for a recess. We'll take a 15-minute recess.

THE CLERK: All rise.

(Jury out.)

THE COURT: All right.

THE CLERK: Court is now in recess.

(Recess from 10:39 a.m. to 10:55 a.m.)

THE CLERK:  All rise.  Court resumes in session.

THE COURT:  You may be seated.

(Brief pause.)

THE CLERK:  All rise for the jury.

(Jury in.)

THE COURT:  You may be seated.

Mr. Shin, you may continue.

BY MR. SHIN:

Q.  Mr. Jimenez, do you understand that you are still under oath?

A.  Yes.

Q.  And I should have asked at the outset, are you experiencing some back pain today?

A.  Yes.

Q.  And did you take some medication for that today?

A.  Yes.

Q.  Is that affecting your ability to understand my questions or what's going on today?

A.  No.

MR. SHIN:  Okay.  If I could publish again for the jury Exhibit 205, which is in evidence?

THE COURT:  Yes.

BY MR. SHIN:

Q.  Sir, I want to direct your attention back to the caption

here.  Do you know whose caption that is?

A.  No.

Q.  Okay.  I want to -- I will turn back to Exhibit 204-T, which is in evidence.

Sir, do you remember being asked about a video and the following photograph?

A.  Yes.

Q.  Do you remember that?

And the defendant sent those?

A.  Yes.

Q.  Did you understand that picture and photograph to be context for what the defendant wrote in Exhibit 201?

MS. SINGER:  Objection.

THE COURT:  Can you do it another way?

BY MR. SHIN:

Q.  How long after the defendant sent the messages in 201 did you receive this video and photograph?

A.  I believe a few hours.

Q.  Did you understand it to be a continuation of the same conversation?

MS. SINGER:  Objection, leading.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Yes.

BY MR. SHIN:

Q.   And at the bottom of the photograph here, do you see the words "When we have rank"?

A.   Yes.

Q.   Did the defendant send those words to you?

A.   Yes.

          MR. SHIN:   We can take this down, please.  Thank you.

          And I'm sorry.  If we can publish 201-T once again for the jury.

          THE COURT:  All right.

BY MR. SHIN:

Q.   I'm showing you again, sir, Government Exhibit 201-T.  At any time after the defendant sent this to you, did he say that he was joking?

A.   No.

Q.   Did he say that he made this up?

A.   No.

Q.   Did he say, "This is just an FYI"?

A.   No.

Q.   After seeing these messages, did you contact an HSI agent?

A.   Yes.

Q.   How long after seeing these messages did you wait to contact that HSI agent?

A.   Almost immediately.

Q.   So you did not wait very long?

A.   Pardon me?

Q.   So you didn't wait long?

MS. SINGER:  Objection.

THE COURT:  Sustained.

BY MR. SHIN:

Q.   Did you have the defendant's phone number saved into your phone?

A.   Yes.

Q.   Did you call and text the defendant?

A.   Yes.

MR. SHIN:  If I could show just the witness Exhibit 203.

BY MR. SHIN:

Q.   Do you see Exhibit 203 on your screen, sir?

A.   Yes.

Q.   Is this a photograph of the defendant's contact information?

A.   Yes.

Q.   Was this saved onto one of your phones?

A.   Yes.

MR. SHIN:  The government would move to admit Exhibit 203 into evidence and publish.

MS. SINGER:  No objection.

THE COURT:  The exhibit is received in evidence, 203.

(Government Exhibit No. 203 was received in evidence.)

BY MR. SHIN:

Q.   Is this contact saved as "J Monkey Juan"?

A.   Yes.

Q.   And the phone number on the screen here, (312) 489 --
excuse me.

     The phone number on the screen here in front of you,
whose phone number is that?

A.   Juan's.

Q.   Did you reach out to HSI -- excuse me.  Strike that.

     When you reached out to HSI about the defendant's
message, did you contact a specific agent?

A.   Yes.

Q.   What was that agent's first name?

A.   Travis.

Q.   Is Travis one of the agents sitting at the government's
table here?

A.   No.

Q.   Did Travis put you in touch with one of these agents after
you reached out to him?

A.   Yes.

Q.   Is this case the first time you provided information to law
enforcement?

A.   No.

Q.   Do you have a history of doing that?

A.   Yes.

Q.   Is that how you know Travis?

A.   Yes.

Q.   When did you start providing information to law enforcement?

A.   Mid-'90s.

Q.   And when you started, what agency were you working -- excuse me -- what agency were you working with?

A.   Local PD.

Q.   Which -- and local PD, what do you mean?

A.   Local police department.

Q.   Which local police department?

A.   Franklin Park.

Q.   Are you still working with Franklin Park PD?

A.   No.

Q.   At some point did you also start providing information to federal agencies?

A.   Yes.

Q.   Which federal agencies?

A.   DEA and HSI.

Q.   When did your relationship with HSI start?

A.   Over 15 years ago.

Q.   And did that relationship continue through the time you contacted Travis in this case?

A.   Yes.

Q.   Was there ever a time you were compensated for information you provided to law enforcement?

A.  I don't recall.

Q.  I'll ask you again.

Were you ever paid for information you provided to law enforcement?

MS. SINGER:  Objection, asked and answered.

BY THE WITNESS:

A.  Yes.

THE COURT:  Overruled.

BY MR. SHIN:

Q.  How many times?

A.  I don't recall.

Q.  Do you recall when you were paid?

A.  I don't recall.

Q.  Was that sometime within the last 10 years?

A.  I don't recall.

Q.  Which agency paid you?

A.  I don't recall.

Q.  Do you remember if it was enough money to buy a new car?

A.  No.

Q.  Was it enough money to buy a new house?

A.  No.

Q.  Was that before you reached out to Travis in this case?

A.  Yes.

Q.  As a result of information you provided to law enforcement, did any of those agencies assist you with your -- with

obtaining permanent resident status?

A.   I did the procedure.

Q.   But -- and when you say, "I did the procedure," what do you mean?

A.   I, you know, went through the process.

Q.   The application process?

A.   Yes.

Q.   But as far as you know, did agencies -- did any agencies help you with that process?

A.   No.

Q.   In your time providing information with law enforcement, did you form relationships with particular members of law enforcement?

        MS. SINGER:  Objection, relevance.

        THE COURT:  What does it go to?

        MR. SHIN:  I'll withdraw the question.

        THE COURT:  All right.

BY MR. SHIN:

Q.   Prior to involvement in this case, did you know who the agents seated at this table were?

A.   No.

Q.   As a legal permanent resident, are you eligible for renewal at some point in the future?

A.   I believe so.

Q.   When would that status need to be renewed?

A.   I believe a couple years.

Q.   And at that time would you be also eligible to apply for citizenship?

MS. SINGER:  Objection, relevance.

THE COURT:  Does it go to credibility or --

MR. SHIN:  I'll withdraw the question, Your Honor.

THE COURT:  Okay.

BY MR. SHIN:

Q.   When you reached out to Travis about the defendant's message, were you expecting anything in return from the federal government?

A.   No.

Q.   Sitting here today, are you expecting anything from the federal government?

A.   No.

Q.   Did anyone from the federal government promise you anything for your assistance in this case?

MS. SINGER:  Objection.

THE COURT:  Overruled.

BY MR. SHIN:

Q.   Did anyone from the federal government promise you anything for your assistance in this case?

A.   No.

Q.   Prior to you sharing the defendant's message with Travis, did any federal agency ask you to collect evidence against the

defendant?

MS. SINGER: Objection.

THE COURT: Overruled.

BY THE WITNESS:

A. No.

BY MR. SHIN:

Q. Were you the one to bring the message first to the attention of HSI?

A. Yes.

Q. Were you paid anything for your involvement in this case?

A. No.

Q. Prior to receiving the messages we saw in Government Exhibit 201, did you tell the defendant that you had done some prison time?

A. I believe there was a conversation.

Q. Have you done some prison time before?

A. Yes.

Q. Do you have a felony conviction on your record?

A. Yes.

Q. When was that felony conviction?

A. Probably 2001.

Q. And approximately when did you complete your sentence for that conviction?

A. 2006.

Q. A little while ago do you recall testifying that you had

provided information to law enforcement starting in the mid-'90s?

A.   Yes.

Q.   As far as you know, did your assistance to law enforcement result in any benefit to you in your 2001 case?

A.   No.

Q.   Did you provide information to law enforcement even after you finished your sentence for the 2001 case?

A.   Yes.

Q.   Through your business, do you know people in the Chicagoland area?

A.   Yes.

Q.   Do you know property owners?

A.   Yes.

Q.   People looking for work at construction sites?

A.   Yes.

Q.   Prior to the defendant sending the messages in Exhibit 201 to you, did he ask you about your connections?

A.   Yes.

Q.   Generally speaking, what did he want to know about your connections?

          MS. SINGER:   Objection, foundation.

          THE COURT:   Sustained.

BY MR. SHIN:

Q.   Did he ask you questions about your business?

MS. SINGER: Objection, foundation.

THE COURT: Where? When? Who was present?

BY MR. SHIN:

Q. How many construction projects did the two of you work on together?

A. Around five.

Q. On those projects, did you also hire other people?

A. Yes.

Q. Have you been to Little Village before for your work?

A. Yes.

Q. Is that -- is Little Village where the defendant lives?

A. Yes.

Q. Do you recall a time when the defendant ran into you in Little Village?

MS. SINGER: Objection, foundation.

THE COURT: Well, we'll start with the answer to that question, then lay your foundation.

BY THE WITNESS:

A. No, I don't recall.

BY MR. SHIN:

Q. How often did you and the defendant speak to each other?

A. He would talk about work, and sometimes we would talk about every -- sometimes once every day or --

Q. I'm sorry. My question was, how often did you guys talk to each other?

A.   Often.

Q.   When you say "often," can you say approximately how many times a week?

A.   A few times.

Q.   Did you speak to each other in Spanish?

A.   Yes.

Q.   Without getting into the details, did he talk to you about his personal life?

A.   Yes.

Q.   And without getting into the details, did he talk to you about his family?

A.   Yes.

Q.   Do you believe that the defendant trusted you?

A.   Yes.

        MR. SHIN:  If I may have a moment, Your Honor?

        THE COURT:  Yes.

   (Counsel conferring.)

BY MR. SHIN:

Q.   Did the defendant ever tell you about his views on immigration?

        MS. SINGER:  Objection, foundation.

        THE COURT:  Sustained.

   (Counsel conferring.)

BY MR. SHIN:

Q.   Did you ever have a conversation with the defendant about

immigration?

A.   Yes.

Q.   Approximately how many times?

A.   More than a few times.

Q.   Was that over the phone?

          MS. SINGER:  Objection, leading.

          THE COURT:  Sustained.

BY MR. SHIN:

Q.   When you had those conversations, what did he tell you?

          MS. SINGER:  Objection, foundation.

          THE COURT:  Sustained.

BY MR. SHIN:

Q.   When you had conversations about immigration, when did those conversations occur?

A.   Either at jobsites or over the phone.

Q.   And in those conversations, what did he tell you?

          MS. SINGER:  Objection, foundation.

          THE COURT:  Sustained.

          MR. SHIN:  No further questions for this witness, Your Honor.

          THE COURT:  All right.  Thank you.

          MS. SINGER:  May I proceed, Your Honor?

          THE COURT:  You may.

                    CROSS-EXAMINATION

BY MS. SINGER:

Q.   Mr. Jimenez, you seem to be in some pain today; is that correct?

A.   Yes.

Q.   You have back pain?

A.   Yeah, I have a fusion surgery, and I had an episode on Sunday.

Q.   And that affects your back?

A.   Correct.

Q.   Now, your back pain preceded October of 2025, correct?

A.   Preceded meaning --

Q.   I can rephrase it.

     You've had that back pain for a long time?

A.   Yeah, I had surgery for it.

Q.   And you had an injury years before 2025 that affected your back; is that correct?

A.   Yes.

Q.   And so in October of 2025, you had back problems, correct?

A.   Not back pain.

Q.   Not back pain?

A.   No.

Q.   Okay.  The injury that happened causing your health issues, though, were before October of 2025?

A.   Can you repeat the question?

Q.   Sure.  The injury that you had causing your back issues happened before October of 2025?

A.   Yes.

Q.   You've been in the United States for a long time, right?

A.   Yes.

Q.   And you work here?

A.   Yes.

Q.   And you've worked here for some time?

A.   Yes.

Q.   And you indicated that you've owned a construction company right now?

A.   Yes.

Q.   And you've been in the construction business for, what, almost 20 years, if not more?

A.   Yes.

Q.   Now, the government raised a criminal conviction from over 20 years ago, right?

A.   Yes.

Q.   That's the only criminal conviction that you have?

A.   No, I have a battery charge.

Q.   Okay.  In the past 20 years, though, that's -- let me put it this way.

     You said you were released from prison or after -- let's see, after serving some time, right?

A.   Yes.

Q.   You've never gone back to prison?

A.   No.

Q. Okay. You are -- you have a family?

A. Yes.

Q. You work?

A. Yes.

Q. And you're a family man?

A. Yes.

Q. And you want to continue working?

A. Yes.

Q. And you want to continue staying in the United States?

A. Yes.

Q. And you take care of your kids, take care of your wife?

A. Yes.

Q. You're not somebody that commits murder-for-hire, right?

A. Nope.

Q. You're not somebody that commits murders?

A. Nope.

Q. You're not someone that commits crimes even?

A. Nope.

Q. You wouldn't capture or grab -- I think is the word you used -- an immigration official or anyone for any amount of money?

A. No.

Q. Now, the government asked you some questions about Snapchat. Do you remember those questions?

A. Yes.

Q. Okay. And you indicated that you're familiar with Snap because you've used it for the past couple years; is that right?

A. A few years.

Q. Okay. And part of a function of Snapchat is that the messages disappear, right?

A. Yes.

Q. Okay. Snapchat is just a communication form, though?

A. Social media.

Q. It's a way to communicate with other people?

A. Yes.

Q. By text, by calls, by video?

A. I believe so.

Q. Okay. Now, you indicated that -- to the government that if in Exhibit 201, it would have disappeared if you hadn't taken the screenshot of it from another phone, right?

A. Yes.

Q. That doesn't just apply to Exhibit 201; that's any message that you receive if you didn't take a screenshot of it?

A. There's settings where you could, perhaps, change them and leave them.

Q. Okay. So you use Snapchat?

A. Yes.

Q. You use it to talk to people?

A. Yes.

Q. And other people, not Juan, that you speak to over Snapchat, right?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. And if you don't take a screenshot of those messages, the messages will disappear?

A. Not all of them.

Q. Okay. On direct examination you said that a main feature of Snapchat is that the messages disappear, right? That was your testimony?

A. Yeah, it's up to the person's settings.

Q. Okay. I'm sorry?

A. I believe it's the person's choice settings.

Q. Okay. I'm going to ask this again.

On direct examination you testified that a main function of Snapchat is that the messages disappear. Do you remember testifying to that?

A. Yes.

Q. Okay. And a function of Snapchat is that messages disappear, correct?

A. Yes.

Q. Not just Exhibit 201. Other messages on Snapchat would disappear also, correct?

A. Yes.

Q. So it's fair to say that many messages on Snapchat disappear?

A. Yes.

MS. SINGER: If we could pull up -- if you could pull up 201 for me.

Judge, I'm going to --

(Counsel conferring.)

MS. SINGER: And, Your Honor, this is marked as, and already been published, Government's Exhibit 201. If we could publish to the jury.

THE COURT: Yes.

MS. SINGER: Thank you.

BY MS. SINGER:

Q. Can you see that on your screen, sir?

A. Yes.

Q. Okay. And that's Government Exhibit 201, correct?

A. Yes.

Q. You were asked questions about this on direct examination, correct?

A. Yes.

Q. Okay. Now, you testified that after you received this, you sent something back; is that correct?

A. Yes.

Q. And what did you say?

A. *"Y eso qué."* (Phonetic)

Q.   And what does that mean in English?

A.   "What about that?"

Q.   Now, that's not on there, correct?

A.   No.

Q.   Okay.  After you received Government Exhibit 201, you testified that there were some other messages and screenshots that you received from Juan that you took your own screenshots of, correct?

A.   Not screenshots.  Pictures.

Q.   Pictures?

A.   Yes.

Q.   Okay.  Nowhere in 201 did Juan say to you:  "Hey, are you interested in this?"  That's not there, right?

A.   No.

Q.   Juan never said to you:  "Hey, why don't you go do this," right?

A.   No.

Q.   Juan never said to you:  "Why don't you go do this," right?

A.   No.

Q.   Juan never said to you:  "Share this message and make sure it gets out," right?

A.   No.

Q.   Juan never said to you:  "Hey, here's where Bovino is going to be next," right?

A.   No.

Jimenez - cross

61

Q. Juan never said to you: "Hey, Bovino is going to be in Broadview. Why don't you go to Broadview," right?

A. No.

Q. Juan never said -- sent -- said to you: "Hey, here's a picture of cash" or "I have somebody that can pay you all this cash," right?

A. No.

Q. The government asked you some questions about 201 and the timing of when you received 204 or 204-T. Do you remember that? They just asked you some questions moments ago?

A. Yes.

Q. And you indicated that -- I believe you said that 204 was a few hours later; is that right?

A. I believe so.

Q. Okay. Can you -- it was the same day?

A. I believe my -- the next day, perhaps.

Q. The next day?

A. Yeah.

Q. Okay. And in that time period between 201 and 204, you never went to Broadview, right?

A. No.

Q. Do you need a moment?

A. I'm just adjusting myself.

Q. Okay. You never went to find Bovino, right?

A. No.

Q.  Okay.  And Juan never followed up and said, "Hey, are you going to go find Bovino"?

A.  He just would send me the other messages.

Q.  He never said to you:  "Hey, are you going to go find Bovino"?

A.  No.

MS. SINGER:  Could I have one moment, Judge?  Just one moment, Your Honor.

(Counsel conferring.)

MS. SINGER:  Nothing further, Your Honor.

THE COURT:  All right.  Redirect?

MR. SHIN:  We can actually leave the exhibit on the screen.

REDIRECT EXAMINATION

BY MR. SHIN:

Q.  Sir, do you recall just being asked on cross-examination questions about what the defendant did not say to you?

A.  Yes.

Q.  But the things on the screen here, who sent that to you?

A.  Juan.

Q.  Did he say, "2k on info when they catch him"?

A.  That's what he says.

Q.  Did he say, "10k if you take him down"?

A.  That's what he says.

Q.  And did he include a photograph of the chief of

immigration, as you refer to him?

A.   Yes.

Q.   On cross-examination do you recall questions about Snapchat and disappearing messages?

A.   Yes.

Q.   Did the defendant have your phone number?

A.   Yes.

Q.   Did he send you text messages?

A.   Yes.

Q.   Could he have sent you this information over text message?

A.   Yes.

Q.   Did he send this information to you over text message?

A.   No.

Q.   Do you recall also being asked on cross about a battery conviction?

A.   Yes.

Q.   How long ago was that conviction?

A.   I believe it was '96.

Q.   How old were you?

A.   16, 15.

Q.   Did you serve any prison time for that conviction?

A.   No.

            MR. SHIN:  No further questions.

            THE COURT:  All right then.  Thank you for your testimony.  You are excused.

THE WITNESS:  Thank you.

Can somebody help me get up?

(Witness excused.)

THE COURT:  You may call your next witness.

MR. YONAN:  Your Honor, the government calls Chris Perugini.

(Brief pause.)

THE COURT:  Good morning.  Raise your right hand to be sworn.

THE CLERK:  You do solemnly swear that all of the statements you are about to make in this case will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, I do.

(Witness sworn.)

MR. YONAN:  May I proceed, Your Honor?

CHRISTOPHER PERUGINI, GOVERNMENT'S WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MR. YONAN:

Q.  Good morning, sir.  Could you please state your name for the record and spell your name for the record?

A.  Yes.  My name is Christopher Perugini, C-h-r-i-s-t-o-p-h-e-r, last name P-e-r-u-g-i-n-i.

Q.  Where are you currently employed?

A.  I am a special agent with Homeland Security Investigations.

Q.   For how long have you been employed as a special agent with Homeland Security Investigations?

A.   About six years.

Q.   And Homeland Security Investigations, is that commonly referred to as HSI?

A.   Yes.

Q.   Is HSI part of a department of the United States Government?

A.   Yes.

Q.   What department is that?

A.   The Department of Homeland Security.

Q.   Prior to working as an HSI special agent, did you have experience -- prior experience as a federal law enforcement officer?

A.   Yes.

Q.   Approximately how many years?

A.   Approximately three to four prior.

Q.   As part of your duties as an HSI special agent, were you assigned to this case involving the defendant?

A.   Yes.

Q.   Were you what's called one of the case agents on this matter?

A.   Yes.

Q.   When approximately did this investigation begin?

A.   Approximately October 2nd, October 3rd.

MR. YONAN: Your Honor, may I publish for the jury Government Exhibit 201, which has been entered into evidence?

THE COURT: It has been received, is that what you said?

MR. YONAN: It has been received into evidence.

THE COURT: Yes, you may.

BY MR. YONAN:

Q. Do you see Government Exhibit 201 on the screen in front of you?

A. Yes.

Q. When did this investigation begin in relation to this exhibit?

A. When I received the information, I believe it was either that night or the following morning.

Q. Did -- was the defendant under investigation prior to this message being sent, to your knowledge?

A. Not to my knowledge.

Q. Did you receive this information that is in Government Exhibit 201 from anyone other than Mr. Jimenez, who just testified?

A. From Mr. Jimenez to Travis to me, yes.

Q. Did you conduct an interview with the defendant?

A. Yes, I did.

Q. Do you see the individual in court today who you interviewed?

A.   Yes.

Q.   Can you please identify him?

A.   Yes.  The gentleman sitting at the defense table with a gray suit, gray tie, white shirt.

MR. YONAN:  Your Honor, may the record reflect that the witness has identified the defendant?

THE COURT:  It may reflect.

BY MR. YONAN:

Q.   On what date did the interview take place?

A.   Approximately October 6th.

Q.   And what time of day did it take place?

A.   Early afternoon around, I want to say, approximately noon.

MR. YONAN:  Your Honor, may I no longer publish to the jury?

THE COURT:  Yes.

MR. YONAN:  Is it not published?  Okay.  Good.

THE COURT:  It's gone now.

BY MR. YONAN:

Q.   Who was present for the interview besides you and the defendant?

A.   Also present was Special Agent Donald Adams and Task Force Officer Robert Ramirez.

Q.   Was the interview recorded?

A.   Yes.

Q.   Prior to the -- your testimony today, were you aware that

Government Exhibit 101 is the entirety of that interview?

A.   Yes.

Q.   Did you review prior to your testimony here today six clips that were taken from Government Exhibit 101, which have been labeled Exhibits 101-1, 101-2A, 101-2B, 101-2C, 101-2D, 101-2E, 101-2F, and 101-2G?

A.   Yes.

Q.   Were those clips true and accurate copies taken from Government Exhibit 101, the recording with the defendant?

A.   Yes.

        MR. YONAN:  Your Honor, we would move at this time to admit into evidence Government Exhibits 101-1, 101-2A, 101-2B, 101-2C, 101-2D, 101-2E, 101-2F, and 101-2G.

        MR. BEDI:  No objection pending Your Honor's previous ruling.

        THE COURT:  The exhibits are received in evidence.

   (Government Exhibit Nos. 101-1, 101-2A, 101-2B, 101-2C,
    101-2D, 101-2E, 101-2F, and 101-2G were received in
    evidence.)

BY MR. YONAN:

Q.   Prior to your testimony, did you also review transcripts that had been prepared of the recordings that were those exhibits?

A.   Yes.

Q.   And those -- those exhibits marked as -- that you reviewed

marked as 101-1 TR, 101-2A TR, 101-2B TR, 101-2C TR, 101-2D TR, 101-2E TR, 101-2F TR, and 101-2G TR?

A.   Yes.

Q.   To the best of your knowledge, do those transcripts fairly and accurately depict what is contained in the recording clips?

A.   Yes.

MR. YONAN:  Your Honor, permission to publish the transcripts in addition to publishing the recordings?

THE COURT:  You may publish.

MR. YONAN:  Your Honor, may I have just a brief moment at sidebar?

THE COURT:  Yes.

MR. YONAN:  I'm sorry, Your Honor.  Could we have a brief sidebar?

THE COURT:  Yes, yes.

(Proceedings heard at sidebar on the record:)

MR. YONAN:  Your Honor --

THE COURT:  Yes.  Go ahead.

MR. YONAN:  Your Honor, there are portions of the transcript per the Court's ruling that have been redacted, and they are labeled in the transcript as redacted, and in the recording they are essentially just muted.

I think it would be appropriate for the Court to just say something, that there are portions of it -- of the recording that have been redacted, and that's -- it's not a

reflection on anything that's said. It's not a reflection on either of the parties.

THE COURT: Okay.

MR. BEDI: I think it's also -- the limiting instruction is, there are portions of the transcript and video that have been redacted. It is not for the jury to speculate as to what those redactions are.

MR. YONAN: Agreed.

THE COURT: Okay. We can end.

(End of sidebar proceedings.)

THE COURT: Ladies and gentlemen, I just want to tell you that there are portions of these transcripts of the interview that have been what we call "redacted" or taken out of these recordings for presentation in court.

So you are not to speculate about why they were taken out or what was taken out.

Okay. Go ahead.

MR. YONAN: So, Your Honor, permission to publish Government Exhibit 101-1. And I would present that -- that's the recording. I would present that alongside of Government Exhibit 101 TR.

THE COURT: All right.

MR. BEDI: Judge, I have no objection. And just in the interest of speed here, I don't have any objection to the government doing that with the exhibits they laid out.

THE COURT: All right.

MR. YONAN: May I publish, Your Honor?

THE COURT: You may.

(Said video recording played in open court.)

MR. YONAN: Apologize, Your Honor. If we can just stop for one second.

(Brief pause.)

MR. YONAN: All right. I will continue, Your Honor, if I may.

THE COURT: You may.

(Said video recording played in open court.)

MR. YONAN: Your Honor, may I start from the beginning? Just I think it wasn't working properly.

THE COURT: All right.

(Said video recording played in open court.)

BY MR. YONAN:

Q. If I may stop you there.

Agent Perugini, could you just identify the people who are in the video starting with -- if you could just identify them, what they're wearing?

A. Yes. So I am seated nearest to the computer wearing a gray hat. The Task Force Officer Robert Ramirez is to my immediate side wearing a gray T-shirt, and Special Agent Adams is in the corner with a black T-shirt. And across the table in the neon is the defendant.

(Said video recording played in open court.)

BY MR. YONAN:

Q.   Agent Perugini, the first part of the address there has been redacted, but you did hear the entire address during the interview; is that correct?

A.   That's correct.

Q.   Do you know in what neighborhood of Chicago the defendant lives?

A.   Little Village neighborhood.

MR. YONAN:   May I continue, Your Honor?

THE COURT:   Yes.

(Said video recording played in open court.)

MR. YONAN:   So that's the end the first clip, Your Honor.

Before I play the next clip, may I -- permission to publish Government Exhibit 201, which has already been entered into evidence?

THE COURT:   Yes.

BY MR. YONAN:

Q.   Agent Perugini, as part of the next clip, did you show the defendant a portion of the Government Exhibit 201?

A.   Yes.

Q.   What portion did you show him?

A.   I showed him the portion beneath the photograph of Mr. Bovino.

Q.   The portion that contains the writing?

A.   Correct.

Q.   And had you previously shown -- well, let me ask you this first.

     Do you recognize the individual who is pictured in Government Exhibit 201?

A.   Yes.

Q.   Who is that individual?

A.   Mr. Gregory Bovino.

Q.   Do you know Mr. Bovino's position?

A.   At the time he was leading Operation Midway Blitz in the Chicago area.

Q.   Is he affiliated with a particular law enforcement agency?

A.   Yes, with the United States Border Patrol.

Q.   Do you know what -- I'm sorry if you said it.

     Do you know what the name of that immigration operation was?

A.   Operation Midway Blitz.

Q.   Prior to showing the defendant a portion of Government Exhibit 201, did you show him a picture of Gregory Bovino?

A.   Yes.

     MR. YONAN:  Your Honor, at this time I would seek to play Government Exhibit 102-2A along with the transcript of 101-2A TR.

     THE COURT:  Yes.

(Said video recording played in open court.)

MR. YONAN: I think we lost the second part of the transcript, Your Honor, but I'll just keep playing.

(Said video recording played in open court.)

MR. YONAN: Your Honor, permission to publish the next clip, 101-2B-1 and 101-2B TR.

THE COURT: You may publish.

(Said video recording played in open court.)

MR. YONAN: Your Honor, we would next seek to publish Government Exhibit 101-2C along with the transcript.

THE COURT: You may publish.

(Said video recording played in open court.)

MR. YONAN: Your Honor, at this time we would seek to publish 101-2D along with the corresponding transcript.

THE COURT: You may publish.

(Said video recording played in open court.)

MR. YONAN: Your Honor, permission to publish 101-2E along with the corresponding transcript.

THE COURT: You may.

(Said video recording played in open court.)

MR. YONAN: Your Honor, if I may publish 101-2F along with the corresponding transcript.

THE COURT: Yes.

(Said video recording played in open court.)

MR. YONAN: Your Honor, permission to publish the last

clip, 101-2G and the corresponding transcript.

THE COURT: You may publish.

(Said video recording played in open court.)

MR. YONAN: Your Honor, if I may not publish any longer.

BY MR. YONAN:

Q. Sir, as part the interview, did you obtain the defendant's phone?

A. It was obtained during his arrest prior to the interview.

MR. YONAN: Your Honor, may approach the witness?

THE COURT: Yes.

BY MR. YONAN:

Q. Showing you what has been marked as Government Exhibit 501, can you tell us what Government Exhibit -- do you recognize Government Exhibit 501?

A. Yes.

Q. What do you recognize Exhibit 501 to be?

A. The cellular telephone located on the defendant's person.

MR. YONAN: Your Honor, we would move to admit the cell phone into evidence as physical evidence.

MR. BEDI: No objection.

THE COURT: Any objection?

All right. I'll receive it -- the cell phone in evidence.

(Government Exhibit No. 501 was received in evidence.)

MR. YONAN:  Your Honor, may I publish for just the witness?

BY MR. YONAN:

Q.  Sir, do you see in the screen in front of you Government Exhibit 502?

A.  No, I don't have anything on my screen.

Q.  Sorry.  Let me hit this button.

All right.  Now do you see Government Exhibit 502?

A.  Yes.

Q.  What do you -- do you recognize Government Exhibit 502?

A.  Yes.

Q.  What do you recognize Government Exhibit 502 to be?

A.  It is a consent to search form that I filled out during the interview for the cellular telephone.

Q.  Did the defendant sign that consent form?

A.  Yes.

MR. YONAN:  Your Honor, I would move to admit --

BY MR. YONAN:

Q.  And what about the second page of the form?  Is that on the screen in front of you?

A.  Yes.

Q.  And what is the second page of the form?

A.  This is another consent to search form that I attached to the other one, kind of gets more biographical about the phone, such as serial number and identifiers for the phone

specifically as well as the password written on it.

MR. YONAN:  Your Honor, the government would move to admit Exhibit 502 in evidence.

MR. BEDI:  No objection.

THE COURT:  Exhibit 502 is received in evidence.

(Government Exhibit No. 502 received in evidence.)

MR. YONAN:  And permission to publish?

THE COURT:  Yes.

BY MR. YONAN:

Q.  Now, does this exhibit list the defendant's telephone number?

A.  Yes.

Q.  What is his -- what is his telephone number?

A.  (312) 489-7040.

Q.  And did the defendant sign the exhibit at the bottom?

A.  Yes.

Q.  Is that his signature on the form?

A.  Yes, next to the X.

Q.  On the second page, is there some additional detail about the phone?

A.  Yes.

Q.  And what kind of phone was it?

A.  An Apple 16.

Q.  And what is -- what is the serial number as listed on there?

A.   K72KXYP705.

MR. YONAN:  Your Honor, if I could clear the screen without any publishing.

BY MR. YONAN:

Q.   Now, after -- as part of your interview, did you conduct a preliminary search of the defendant's phone?

A.   Yes.

Q.   Did you identify some items that you took photographs of?

A.   Yes.

Q.   And can you describe how you took those photographs?

A.   I took those photographs with my government cell phone.

Q.   And what were you taking photographs of?

A.   Messages that I had located on defendant's phone during my preliminary review.

MR. YONAN:  Your Honor, I would seek to publish for just the witness at this time Government Exhibit 301.

THE COURT:  You may.

BY MR. YONAN:

Q.   Do you see Government Exhibit 301 on the screen in front of you?

I'm sorry.  Let me -- do you see Government Exhibit 301 on the screen in front of you?

A.   Yes.

Q.   What is Government Exhibit 301?

A.   A text string I -- on defendant's phone with the photograph

of Mr. Bovino.

Q. And how did you -- how do we have that text string? What did you do to obtain that?

A. This is a photograph I took of defendant's phone.

MR. YONAN: Your Honor, at this time the government would move to admit Government Exhibit 301 into evidence.

MR. BEDI: No objection.

THE COURT: Exhibit 301 is received in evidence.

(Government Exhibit No. 301 was received in evidence.)

MR. YONAN: May I publish for the jury?

THE COURT: You may.

BY MR. YONAN:

Q. Can you describe for the ladies and gentlemen of the jury what's contained on Government Exhibit 301?

A. Yes. It's a messaging string on defendant's phone where a picture of Mr. Bovino was sent.

Q. And who does it appear to be the text string with?

A. A contact card named "cody adjustable plug."

MR. YONAN: Your Honor, if I may clear the screen.

THE COURT: Yes.

MR. YONAN: And publish just for the witness Government Exhibit 302.

THE COURT: You may publish.

BY MR. YONAN:

Q. Sir, do you see Government Exhibit 302 on the screen in

front of you?

A.  Yes.

Q.  Can you describe for the ladies and gentlemen of the jury what that is, Government Exhibit 302?

A.  Yes.  It looks to be a Snapchat message with Bby Spooks D27.

Q.  And how did you obtain what is Government Exhibit 302?

A.  It was, I believe, in the camera roll on defendant's phone.

Q.  And is this a picture you took of his phone?

A.  Yes.

MR. YONAN:  Your Honor, the government seeks to admit Exhibit 302 into evidence.

THE COURT:  Any objection?

MR. BEDI:  Judge, no objection if the limiting instruction could be given again.

THE COURT:  All right.  Again, if these are not the words of the defendant, you are not to hold those words against him.

(Government Exhibit No. 302 was received in evidence.)

MR. YONAN:  May I publish?

BY MR. YONAN:

Q.  So, sir, at the top I think you mentioned -- who does -- what's the name that appears to be at the stop -- at the top?

A.  Bby Spooks D27.

Q.  And can you read the first message there that is with the

red line?

A. Yes. It says, "bro we need some ppl pu gw out here. Lets get some guys here bro. Tbh its bs whats goin on."

Q. And what is the response from the person listed as Bby?

A. "We going in a bit."

Q. And what is the response from the person listed as "Me"?

A. "Ill be there cameras are on."

Q. What is the response from the person listed "Bby"?

A. "Let one of us be infront with the" green emoji for a pistol.

Q. What's the response from the person listed as "Me"?

A. "Got u."

Q. What is the response listed from the person "Bby"?

A. "Ok."

MR. YONAN: Your Honor, if I could clear the screen.

If I may have a moment, Your Honor.

(Counsel conferring.)

MR. YONAN: Could I go back, Your Honor, to Government Exhibit 302?

THE COURT: Yes.

BY MR. YONAN:

Q. Did you confront the defendant with this message during your interview?

A. I believe so.

Q. Did he identify this as his message?

A.   I believe so.

        MR. YONAN:  I would like to show just for the witness, Your Honor, if I could show Government Exhibit 303.

        THE COURT:  All right.

BY MR. YONAN:

Q.   Do you see Government Exhibit 303 in front of you, sir?

A.   Yes.

Q.   What is Government Exhibit 303?

A.   A messaging string on defendant's phone.

Q.   Is this a picture that you took from -- from using your phone of defendant's phone?

A.   Yes.

        MR. YONAN:  Your Honor, the government would seek to admit and publish Government Exhibit 303.

        MR. BEDI:  No objection.

        THE COURT:  You may publish.  I'll receive in evidence.

   (Government Exhibit No. 303 was received in evidence.)

BY MR. YONAN:

Q.   At the top can you describe who this message is with?

A.   Yes, it's with the contact card "cody adjustable plug."

Q.   And can you read the first three blue bubbles?

A.   "Yep, it's going down, bro.  My guys are ready in the vill."

Q.   What does the gray bubble read?

A. "Dam what they on."

Q. And can you read for us the last four bubbles?

A. "BS they haven't taken none from the vill and they won't. Kings on the ass N they scared."

Q. Where did you obtain this -- this -- where did you take this picture from?

A. I don't understand.

Q. So where did you find this -- this text string?

A. It was on defendant's phone, I believe, in the recent text messages.

Q. I'm going to show you some pictures now. First --

MR. YONAN: And, Your Honor, if I could just publish for the witness.

THE COURT: You may.

BY MR. YONAN:

Q. I'm going to show you three pictures. First is going to be Government Exhibit 501-A. What is 501-A?

A. It is defendant's telephone.

Q. Did you take that picture of what is government's -- of defendant's cell phone?

A. Yes.

Q. What about 501-B? What is that a picture of?

A. It is the rear of the -- like the other side of the cell phone.

Q. And finally, what is Government Exhibit 501-C?

Perugini - direct

84

A.   This is a photograph in close time to the arrest where a call was placed to defendant's telephone number, and we witnessed the phone we recovered on his person ring.

Q.   So did you take all three photographs that are 501-A, 501-B, and 501-C?

A.   Yes.

          MR. YONAN:  Your Honor, we would seek to move to admit those into evidence.

          MR. BEDI:  No objection.

          THE COURT:  Exhibits are received in evidence.

   (Government Exhibit Nos. 501-A, 501-B, 501-C were received in evidence.)

BY MR. YONAN:

Q.   So I have published first 501-A, if you could describe for the jury what that is.

A.   Yes, it's the defendant -- the cellular telephone located on the defendant at his arrest.

Q.   501-B?

A.   It's the other side of that same cell phone.

Q.   And if you could then describe what is 501-C.

A.   Yes.  So this is in close proximity to the time of arrest, the cell phone that was on defendant's person.  The phone on the right is another phone used by an agent.

          And the phone number (312) 489-7040 was dialed, and I observed the phone that was on defendant at time of arrest ring

accepting an incoming call.

Q.   And that phone on the left is Government Exhibit 501, which you have in front of you?

A.   Yes.

MR. YONAN:  If I may have a moment, Your Honor?

THE COURT:  Yes.

(Counsel conferring.)

MR. YONAN:  No further questions, Your Honor.

THE COURT:  All right then.  It's time for our lunch recess.  We'll resume at 1:15.

You may step down.

THE WITNESS:  Thank you, Your Honor.

THE CLERK:  All rise.

(Jury out.)

THE CLERK:  Court is in recess.

(Recess at 12:25 p.m. until 1:21 p.m.)

86

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )  Case No. 25 CR 637
)
        v.                )
)
JUAN ESPINOZA MARTINEZ,    )  Chicago, Illinois
)  January 21, 2026
        Defendant.         )  1:21 p.m.

VOLUME 1
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE JOAN H. LEFKOW

APPEARANCES:

For the Government:    HONORABLE ANDREW S. BOUTROS
                       UNITED STATES ATTORNEY
                       BY:  MR. MINJE SHIN
                            MR. JASON A. YONAN
                       Assistant United States Attorneys
                       219 S. Dearborn Street, 5th Floor
                       Chicago, Illinois 60604


For the Defendant:     BEDI & SINGER, LLP
                       BY:  MR. JONATHAN S. BEDI
                            MS. DENA M. SINGER
                       53 W. Jackson Boulevard, Suite 1101
                       Chicago, Illinois 60604




Court Reporter:        KELLY M. FITZGERALD, RPR, RMR, CRR
                       Official Court Reporter
                       219 S. Dearborn Street, Room 1412
                       Chicago, Illinois 60604
                       Telephone:  (312) 818-6626
                       kmftranscripts@gmail.com

                    *    *    *    *    *

            PROCEEDINGS REPORTED BY STENOTYPE
    TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; defendant present; jury out:)

THE COURT: You may be seated.

MR. YONAN: Judge, could we address one matter before the jury comes in?

THE COURT: Yes.

MR. YONAN: And this relates to I think an instruction you gave to the jury as I was showing a message that I believe the defendant responded to. And similar to a message that you -- instruction you gave the jury earlier that was more along the lines of a video that I don't know that the defendant responded to. But I guess the point I want to make is, like, I believe you instructed the jury that only defendant's words can be -- can be considered or used, or I don't know the exact way --

THE COURT: Not used against him. I thought that probably was not good.

MR. YONAN: I think it needs to be clarified, particularly when we're talking about text messages in which the defendant is providing response, that the words of others can inform and provide context to the defendant's own responses. So I do think that point needs to be clarified for the jury.

THE COURT: Okay.

So why don't you just tell me, I'll write it down,

what you want me to say; or, here, it can be on the screen.

MR. YONAN:  If I just may have a moment.

(Counsel conferring.)

THE CLERK:  All rise.

(Jury in at 1:23 p.m.)

THE COURT:  All right.  You may be seated.

Good afternoon, ladies and gentlemen of the jury.

Do you have a note for me?

MR. YONAN:  Yes, Your Honor.  Let me -- could I show -- write it and show it to the defense first?

THE COURT:  Yes, please.

(Pause.)

THE COURT:  Agent Perugini, you can come back to the witness stand.

MR. BEDI:  Judge, may I proceed?

THE COURT:  Yes.

MR. YONAN:  We're fine proceeding now, Judge.

THE COURT:  Okay.

CHRIS PERUGINI, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION

BY MR. BEDI:

Q.  Good afternoon.

A.  Good afternoon.

Q.  You're still under oath.  Are you aware of that?

A.  Yes.

Perugini - cross

89

Q. Okay. The government talked a little bit about your training as a law enforcement agent so I want to talk to you a little bit more about that. Okay?

A. Mm-hmm.

Q. Where do you currently work?

A. Homeland Security Investigations.

Q. And how long have you been there?

A. About six years.

Q. And before that, where were you?

A. I was in another agency in Department of Homeland Security.

Q. For about how long?

A. About two.

Q. And before that, did you have any law enforcement?

A. I was a uniformed federal officer in D.C. area for -- before that too.

Q. For how long?

A. About a year.

Q. Any law enforcement before that?

A. No.

Q. Okay. So I'm not supposed to do math in public, but that I feel like is nine years. Is that close to about nine years?

A. Give or take.

Q. Okay. Great. If I mess up the math today, just jump in.

A. It's all good.

Q. And so in those three different positions, you've had

training as a law enforcement officer?

A.   Yes.

Q.   And you've had to go to -- I assume to an academy of some sort?

A.   Yes.

Q.   And in that training, you were taught how to conduct interviews, correct?

A.   Yes.

Q.   Both of witnesses and potential targets of investigation?

A.   Yes.

Q.   And they teach you the ways to do effective interviews, correct?

A.   Correct.

Q.   And they teach you ways to get the information that you're looking for.  Is that fair?

A.   Yes.

Q.   And over the course of your nine, give or take, years as law enforcement, how many different interrogations would you say you were involved in?

A.   A good deal.

Q.   Everybody has a different set of what a good deal would be. Would you say over a hundred?

A.   No, but I wouldn't say it's under ten.

Q.   That's a big delta as well.

        Closer to 50?

A.   Well, depends if it's witnesses or targets.  I mean --

Q.   That -- that was my next question.

So talking about targets.

A.   Say close -- 50 is fair, I would say.

Q.   50?  And it's give or take.

A.   Yeah.

Q.   We're not -- we're not going to hold you to this number.

And so then witnesses, I imagine, are probably more than -- more than the 50 --

A.   Correct.

Q.   -- is that fair?

Some people say it's -- it's about double or maybe a third more, so between 75 and a hundred.  Is that fair?

A.   Yeah.  It would be hard to put a number, but that's fair.

Q.   But close enough?

A.   Yep.

Q.   Okay.  So is it fair to say in your nine years of law enforcement, you have participated in roughly a hundred to 25 to 175 different witness interviews?

A.   Witness and targets?

Q.   Witness and targets, total.  I'm putting them together.

A.   Sure.

Q.   But, again, I'm not supposed to do math in public, so if that is wrong, jump in.

A.   That's fair.

Q.   Okay.  And you were the lead case agent in this?

A.   At the beginning.

Q.   At the beginning.  And then who took over?

A.   Special Agent Adams.

Q.   So when you first were made aware of the text -- the Snapchat communication, you were the lead agent?

A.   Yes.

Q.   And as part of the lead agent, you determined kind of the direction of the investigation.  Is that fair?

A.   That's fair.

Q.   So you would -- you would determine kind of who is talked to, subpoenas that are going out, any testing of physical evidence, things like that?

A.   Yes, with the insight of team members as well.

Q.   Of course.  I mean, you're not working in a silo.  You're working with a group?

A.   Yes.

Q.   You would be ultimately the one who would send out a subpoena under your name or take something to the grand jury. Is that fair?

A.   Not all the time, but --

Q.   But sometimes?

A.   Yes.

Q.   Okay.  Now, turning your attention to October 2025 in Chicago.  Were you stationed in Chicago at that point?

Perugini - cross

93

A.   Yes.

Q.   And so you didn't come from another location to do this investigation.  You were already here.  Fair?

A.   That's fair.  I'm based out of Chicago.

Q.   You're based out of Chicago.

So in October of 2025, ICE and immigration have ramped up their activities.  Is that fair?

A.   Yes.

Q.   And they were engaged in deportation activity?

A.   Yes.

Q.   And they were deporting people who had been here for numbers of years, correct?

A.   It depend on the case, but --

Q.   Of course.

A.   Yeah.

Q.   We're not going to go through case by case.

A.   Sure.

Q.   But generally they were -- they were deporting people who had been here for a number of years?

A.   In some -- in some instances.

Q.   Parents of kids?

MR. YONAN:  Your Honor, I'm going to object to relevance.

THE COURT:  What's the relevance?

MR. BEDI:  Judge, it gives the context for when the

text messages were brought up.  The government brought it up in their -- in their opening.  I brought it up in my opening.

THE COURT:  Overruled.

MR. BEDI:  I'm not asking for a lot of leeway, just a little bit.

BY MR. BEDI:

Q.  And some of these ICE activities were fairly newsworthy. Is that fair?

A.  Yes.

Q.  And as far as you know, members of the community were aware that these were happening?

A.  Yes.

Q.  Okay.  In part of your investigation, you asked to see or get into Mr. Espinoza Martinez's phone, correct?

A.  Yes.

Q.  You were shown Government's Exhibit 501.  Do you remember that?

A.  Yes.

Q.  501 I believe is -- 501 is the -- I believe the pic- -- the consent to search; is that correct?

A.  I don't recall.

MR. BEDI:  Judge, may I have a moment?

(Counsel conferring.)

BY MR. BEDI:

Q.  At some point, Mr. Espinoza Martinez consented to search

the phone, correct?

A.   Yes.

Q.   And on that consent form, there's a passcode?

A.   Yes.

Q.   That passcode was given by Mr. Espinoza Martinez to you, correct?

A.   Correct.

Q.   You didn't -- you didn't guess it, obviously?

A.   Well, it was provided.

Q.   And so he was cooperative with you in consenting to the search of the phone?

A.   Yes.

Q.   And the interview -- and we'll get into some of the specifics of the -- the interview.  The interview that -- the clips that you saw today were just kind of a small amount of the total interview, correct?

A.   Yes.

Q.   And he was -- he was cooperative with you through the -- the totality of the interview.  Is that fair to say?

A.   Yes.

Q.   Okay.  So you were shown and looked at Government's Exhibit 101-1.

     Do you remember that?  It was one of the -- it was the first clip that you were shown.

A.   Okay.

Q.   Do you remember that?

A.   I don't remember the name specifically of them, but I remember the clip, so...

Q.   Okay.  And in that clip, he was -- there was some back and forth.

And you said:  That's not what we're all about.  Right.

And he says:  I want to be honest.  I want you guys to be honest because I'm really confused about this.  I mean, I have no gang affiliation.

Do you remember that?

A.   Yes.

Q.   And it goes on to say -- he goes on to say:  I am -- I'm not nowhere around there.  I work for a living, every day.  I'm a union worker.  I work concrete, so I don't know.

MR. YONAN:  I'm going to object, Your Honor, to hearsay and just simply reading testimony in the record.

MS. SINGER:  What?

MR. BEDI:  Your Honor, it's been --

THE COURT:  It's hearsay?

MR. BEDI:  It's been admitted by the government into evidence.

THE COURT:  Wait.  It's the -- right.  It's the witness's own statement, right?  Overruled.

MR. BEDI:  Thank you.

Perugini - cross

97

BY MR. BEDI:

Q.   He goes on to say -- or you ask:

        You've been in the neighborhood 30 years.

        Mr. Martinez says:  About 30 years.  I was brought here about 3 or 4 years old.

A.   Yes.

Q.   Correct?

        You were also shown Government's Exhibit 101-2A.

        Do you remember that?

A.   Yes.

Q.   And in that you were asked -- you continue to ask him questions, correct?

A.   Yes.

Q.   And when you were asking -- you asked him:

        And I want to tell you -- and I want you to tell me what you think of it.

        And he said:  That was to my -- that was to my friend, I told you.  Yeah.

        MR. YONAN:  Your Honor, I'm going to object again.  The exhibit is in evidence.  I don't believe it's appropriate to be asking questions to -- just to repeat the exhibit that's already into evidence.

        THE COURT:  Probably true.

        MR. BEDI:  Judge, the government has admitted it as their exhibit.  I am allowed to get into some of the specifics

of what was said.

THE COURT: Well, technically you should probably give him a copy of the transcript and ask a question rather than just repeat what's in the --

BY MR. BEDI:

Q.   Well, is your memory exhausted of what was in the clips?

A.   I would -- I would prefer a transcript.

(Counsel conferring.)

MR. YONAN: And I'll just state my objection for the record again, Your Honor, if he's going to --

MR. BEDI:  Judge, maybe we should go to -- maybe we should go to sidebar if there's going to be a back-and-forth.

THE COURT: Okay. All right. Sidebar.

(Proceedings heard at sidebar:)

MR. YONAN: Your Honor, for the record, if he's asking the question based on things that are said in the recording, that's fine, but that's not what he's doing. He's just repeating what the defendant said --

THE COURT: Right.

MR. YONAN: -- and that's not an appropriate way to ask questions of this witness. That has been entered into evidence. He shouldn't just get to repeat certain parts of it that he thinks are better for him.

MR. BEDI:  Judge, I can ask questions about the exhibits that the government admitted in their case-in-chief.

I can say: Did Mr. Martinez say a car is blue or a car is red? They admitted it. Of course I can ask questions about it.

MR. YONAN: Unfortunately, Your Honor, that's not what he's doing. He's just simply reading parts.

THE COURT: Yeah, he's just reading.

It's really highlighting the parts of the transcript that are favorable to you which is more like closing argument. So I'll sustain.

(Proceedings heard in open court:)

MR. BEDI: Thank you, Judge.

BY MR. BEDI:

Q. You had asked a question -- and I'm turning to 101-2B. You had asked a question how he would know about that.

Do you remember what he said?

A. I don't recall.

Q. Okay. Do you recall that he said: I mean, I hear the talks?

A. Yes.

Q. Okay. And you were -- asked him some questions about the 2000 and what that meant. Do you remember that?

A. Yes.

Q. And do you remember what his response was?

MR. YONAN: Your Honor, same objection.

THE COURT: Sustained.

BY MR. BEDI:

Q.   Do you remember him responding to you?

A.   Yes.

Q.   And do you remember what his response was?

MR. YONAN:  Same objection, Your Honor.

THE COURT:  Sustained.

MR. BEDI:  Judge, could I just have one moment?

THE COURT:  Yes.

(Counsel conferring.)

MR. BEDI:  Judge, nothing further.

THE COURT:  All right then.

Any redirect?

MR. YONAN:  Very briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. YONAN:

Q.   You were asked some questions about the consent form that the defendant signed during the interview.  Do you recall that?

A.   Yes.

Q.   And you were asked some questions about him being cooperative during the process.  Do you recall that?

A.   Yes.

Q.   And as I recall, you -- you also were able to take pictures, certain pictures from his phone as part of that interview; is that right?

A.   Yes.

Q.   When was the consent in relation to those pictures?

A.   Shortly after the consent was signed.

Q.   What was shortly after the consent was signed?

A.   The preliminary review of defendant's phone where those pictures were located.

Q.   What came first, the consent or -- or the review of the pictures?

A.   The consent.

MR. YONAN:  Nothing further, Your Honor.

THE COURT:  All right.

MR. BEDI:  Nothing based on that.

THE COURT:  Then you are excused.

THE WITNESS:  Thank you.

THE COURT:  Thank you for your testimony, Agent.

MR. YONAN:  Your Honor, if we may briefly go to sidebar.

THE COURT:  Yes.

MR. YONAN:  Or actually, Your Honor, may I just consult with defense counsel?

THE COURT:  Okay.

(Counsel conferring.)

MR. YONAN:  Your Honor, may I approach?

THE COURT:  Yes, you may.

All right.  This morning I gave you an instruction about a screenshot that was not quite accurate, shall we say, so let me correct that.

Words of others cannot be attributed to the defendant except as context for his own words.

All right.

MR. YONAN:  Your Honor, may I read two stipulations into the record?

THE COURT:  You may.

MR. YONAN:  Stipulation No. 3:  If called to testify, HSI computer forensic analyst Terence McCabe would testify that he processed the Apple Model 16 cellular telephone, assigned telephone number 312-489-7040, made a copy of the contents of the phone and provided a copy to HSI Special Agent Donald Adams to be examined.

So stipulated?

MR. BEDI:  So stipulated.

MR. YONAN:  Stipulation No. 4:  If called to testify, HSI computer forensic analyst Jewelle Grimsley would testify that she received from Special Agent Donald Adams the contents of the Snapchat account monkey2430, processed the contents of that Snapchat account and provided a copy to HSI Special Agent Donald Adams.

So stipulated?

MR. BEDI:  So stipulated.

MR. YONAN:  The government would call Donald Adams to the stand.

THE COURT:  Good afternoon.

THE WITNESS:  Good afternoon.

THE COURT:  Raise your right hand to be sworn.

(Witness sworn.)

THE COURT:  Be seated.

DONALD ADAMS, GOVERNMENT'S WITNESS, DULY SWORN

DIRECT EXAMINATION

BY MR. YONAN:

Q.  Good afternoon, sir.  Could you please introduce yourself for the jury?

A.  Yes.  My name is Donald Adams.

Q.  Where are you currently employed?

A.  Homeland Security Investigations.

Q.  How long have you been employed for Homeland Security Investigations?

A.  A little over a year.

Q.  What is your job title there?

A.  Special agent.

Q.  What did you do prior to becoming an HSI special agent?

A.  I was a local police officer for Markham, Illinois.

Q.  How long did you do that for?

A.  Approximately a year and four months.

Q.  Are you one of the case agents assigned to this matter?

A.  Yes.

Q.  During your work on this case, did you receive certain materials from Snapchat related to the username monkey2430?

A.   Yes.

Q.   What did you do when you received that -- that information?

A.   I then brought them to the computer forensic analyst who takes the raw data and uploads it into Axiom.

Q.   What's Axiom?

A.   It's a device used to take the raw data to make it more readable.

Q.   And did you at some point receive those materials back?

A.   Yes.

Q.   And in what form were they when you received them?

A.   They're in the Axiom account.

Q.   What did you do when you received those materials in the Axiom account?

A.   I then went through the Axiom and tagged items for evidentiary purposes.

Q.   And can you describe for us what you mean by "tagged"?

A.   Within the Axiom account, you can take specific messages and tag them as to separate them from the rest of the personal message that might be in the device.

Q.   What happens when materials get tagged?

A.   You can then extract them.  So the extraction will take the contents from those specific messages from individuals and then put them in a time order that they were sent.

Q.   And so I understand, the ones that -- what happens to the ones that get flagged?  And I --

A.   So only the ones that get flagged will then be extracted into a report.  Those that are not tagged will not be extracted.

Q.   And how was the report broken down in terms of the order of the messages?

A.   So it would be from the specific to/from senders, and then it will be taken from the tagged items, the time and the date that they were sent, in order.

Q.   And when you say the "to" -- was it your testimony the "to" or "from"?

A.   So the individuals that are having conversations, it will break down each individual conversation chat.

Q.   Okay.  And the report that's ultimately generated, does that include all of the message from that in- -- to and from that individual?

A.   No.

Q.   And why not?

A.   It's only the tagged items.

Q.   So when you received the report of the materials, that's not all of the messages between the individuals?

A.   No.

          MR. YONAN:  Your Honor, may I show the witness what has been -- and just for the witness -- what has been marked as Government Exhibit 402.

          THE COURT:  Yes.  Yes.

BY MR. YONAN:

Q. Before I do that, sir, did you also conduct a search of data from a telephone?

A. Yes.

Q. What telephone was that?

A. Juan Espinoza Martinez.

Q. Okay. Where did you obtain that telephone?

A. From the arrest.

Q. Okay. And how did you review the data on the phone?

A. The phone was then brought to our computer forensic analyst who then again took the data from the phone and placed it into an Axiom account.

Q. What did you do with the phone data when you received it?

A. Similar to the Snapchat, I then went through the Axiom account and tagged evidentiary items from the phone.

Q. All right. I'm going to walk you through some documents now. I'm going to start with Government Exhibit 402.

You see Government Exhibit 402 in front of you, Special Agent Adams?

A. Yes.

Q. I'm going to scroll through. It's approximately seven pages so I will just scroll through it for you.

A. It's not moving on my device.

Q. Oh, I apologize. Apologize. Let's see if that works now.

A. Yes.

Q.   All right.  Do you recognize what is Government Exhibit 402?

A.   Yes.

Q.   What is Government Exhibit 402?

A.   It is part of the messages between monkey2430 and o_espinoza12 from the Snapchat return.

Q.   And does Government Exhibit 402 appear to be a true and accurate copy of a message from the Snapchat return?

A.   From the tagged items, yes.

          MR. YONAN:  Your Honor, we move to admit Government Exhibit 402 into evidence.

          THE COURT:  Any objection?

          MR. BEDI:  No objection.

          THE COURT:  All right.  Exhibit 402 is received in evidence.

     (Government's Exhibit No. 402 received in evidence.)

          MR. YONAN:  We would also move to admit Government Exhibit 402T, Your Honor, which contains translations from certain parts from English to Spanish.

          THE COURT:  The exhibit is received in evidence.

     (Government's Exhibit No. 402T received in evidence.)

          MR. YONAN:  Permission to publish Government Exhibit 402T.

          THE COURT:  Yes.

BY MR. YONAN:

Q. So what's at the top of that document, sir?

A. It will tell you it's from the Snapchat messages and then the chat participants, which are monkey2430 and o_espinoza12.

Q. What is reflected -- there is like a blue bubble here. Do you see that?

A. The blue bubble will be the sender. So it will say monkey2430. It's from the device.

Q. What is the date that this particular message was sent?

A. 10/3/2025 at 015 hours.

Q. And do you know the time zone of that from this document?

A. Yes. If you go back one, it will show it. So it's in UTC time.

Q. What is the time zone?

A. UTC time.

Q. UTC, okay.

I'm going to go to the second page of the -- does the -- the bottom part of the first page have what appears to be a photograph?

A. Yes.

Q. Going to the second page, do you see a photograph there?

A. Yes.

Q. Do you recognize the individual who is in that photograph?

A. Yes.

Q. Who is that?

A. Gregory Bovino.

Q.   Can you read for the ladies and gentlemen of the jury the message that's contained directly underneath that picture?

A.   Yes.

It's from user monkey2430 and states:  10K for his head.

Q.   Going to the third page of that document.

Can you read the messages that -- that are underneath that?

A.   Yes.

Again from monkey2430:  Dead or alive, to which he then states:  Shit serious.

Q.   Can you read the messages that follow that?  I'm going to ask you to read the English translations?

A.   Yes.

O_espinoza12 replies:  Fuck, to which monkey2430 then replies:  They're on fire with the top pig.

Monkey2430 then replies again:  LOL.

Q.   Can you then read the next portions of this?

A.   Yes.

O_espinoza12 then says:  Not worth 10K, to which monkey2430 replies:  Not for many bit any infor on his whereabouts and if they catch him, you can fucking make at least 2 to 3 for info.

Q.   And what about underneath that?

A.   He then states -- monkey2430 then states:  They want to get

him in the vill.

Q.   And what is the timing of these messages?

A.   The one from o_espinoza12 is 10/3/25 at 01700 hours and then 01700 hours again for the monkey2430 and then 01800 hours.

Q.   Now, if we go to the next page, there's a message that's later in time; is that correct?

A.   Yes.

Q.   This appears to be a message that's being sent, forwarded?

A.   It's a screenshot of a --

Q.   Okay.

A.   -- post.

Q.   And to go -- I'm going to move on to the next page where -- are there some additional messages?

A.   Yes.

Q.   Okay.  And getting back to what you were saying before, does this necessarily include all of the messages between monkey2430 and o_espinoza12 in this time period?

A.   No.

Q.   And why would it not include certain messages?

A.   If they had no evidentiary value.

Q.   I'm going to then go to the next page and ask you what is the timing of this last message that's contained on there and what appears to be depicted?

A.   2035 hundred hours, and it's a -- looks to me like a 1911 foreign pistol.

Q.   And what does that appear to be that -- is that a screenshot?

A.   Yes.

Q.   Who was sending that?

A.   monkey2430.

     MR. YONAN:  Your Honor, may I show a document only to the witness?

     THE COURT:  Yes.

BY MR. YONAN:

Q.   Sir, do you see Government Exhibit 404 in front of you?

A.   Yes.

Q.   I'm going to scroll through the pages of that.  It's two pages.

     Do you recognize that exhibit?

A.   Yes.

Q.   Is this a document that you pulled from the --

     MR. YONAN:  Your Honor, if I could go back to 402 for one moment.  I appear to have not shown the last page.

     THE COURT:  All right.

BY MR. YONAN:

Q.   So I'm back on 402.

     MR. YONAN:  Could I publish for the jury?

     THE COURT:  Yes.

BY MR. YONAN:

Q.   And just to orient -- orient ourselves, this was the

portion that I asked you about on 402.

Do you recall that?

A. Yes.

Q. I'm going to show you the seventh page and ask you what it says there.

A. Available, 1500 discount price.

Q. Thank you.

MR. YONAN: Your Honor, now if I could go back to just publishing for the witness.

THE COURT: Yes.

BY MR. YONAN:

Q. Is Government Exhibit 404 a message thread that you obtained from the Snapchat account?

A. Yes.

Q. And does it appear to be a true and accurate copy?

A. Yes.

MR. YONAN: Your Honor, the government would move to admit Exhibit 404 and also the corresponding 404T which contains translations.

THE COURT: The exhibit is received in evidence.

(Government's Exhibit No. 404T received in evidence.)

MR. YONAN: Permission to publish 404T.

THE COURT: Yes.

BY MR. YONAN:

Q. Sir, do you see Exhibit 404T in front of you?

A.   Yes.

Q.   What is the display names on this message?

A.   The display names are bibi_flores25 and monkey2430.

Q.   And do you see a message at the bottom of the page here?

A.   Yes.

Q.   What is that message?

A.   It's from monkey2430 on 10/1/25 at 2246 hundred hours.

Q.   And can you read the translation of the -- this -- the title of that?  Actually, what is reflected in that message?

A.   A screenshot of what appears to be a post.

Q.   Okay.  Can you read the translation of what's in that screenshot?

A.   Report of ICE raids in Chicago and surrounding areas.

Q.   And can you read what's contained in there?

A.   Why are they not in uniform, question mark, and dressed like this, period, period.  I don't feel okay about this picture.  This poor guy doesn't even know who is actually detaining him, heartbroken emoji.  It can be a kidnapper for what we know, exclamation point.  Keep an eye on all your surroundings.  We are not safe anymore.  Anyone can act like an agent, exclamation point.  What's worse is that some of our Latinos are not aware of this.

Q.   And can you read what's in the -- the -- what's reflected in the second page of the message?

A.   Yes.

We already know what time it is, exclamation point, exclamation point, hammering time, and then emojis following.

MR. YONAN: Your Honor, may I publish just for the witness?

THE COURT: Yes.

BY MR. YONAN:

Q. Do you see Government Exhibit 405 on the screen in front of you?

A. Yes.

Q. And what is Government Exhibit 405?

A. They are messages from the Snapchat return.

Q. I'm going to scroll through that and ask you, does that appear to be a true and accurate copy of messages you obtained from the Snapchat account?

A. Yes.

MR. YONAN: Your Honor, the government would move to admit Government Exhibit 405 into evidence.

THE COURT: Exhibit 405 is received in evidence.

(Government's Exhibit No. 405 received in evidence.)

MR. YONAN: Permission to publish, Your Honor.

THE COURT: Yes.

BY MR. YONAN:

Q. So what's reflected on the first message in terms of the time, and then what can you see in that message?

A. monkey2430 at 10/4/2025 at 2127 hours -- hundred hours.

Q.   What appears to be -- what is the message?

A.   It appears to be a screen recording.

Q.   And if you scroll -- scroll down further, do you see some writing there?

A.   Yes.

Q.   What does it say?

A.   Where is my SH brothers at, exclamation point, exclamation point.  Be on point, brothers, exclamation point, exclamation point.

Q.   What is that contained in?

A.   That video screen recording, or Snapchat.

Q.   And if you scroll -- go down to the fourth page, what do you see on the fourth page of that exhibit?

A.   A screenshot from another conversation.

Q.   Who is that conversation with?

A.   Bby Spooks D27.

Q.   And can you read the -- the -- what's in that screenshot?

A.   Bro, we need some PPL PUGW out here.  Let's get some guys here, bro.  TBH it's BS what's going on.

     Bby replies:  We going in a bit.

     Me replies:  I'll be here.  Cameras are on.

     Bby replies:  Let one of us be in front, with the green gun emoji.

     Me replies:  Got you, to which Bby responds:  Okay.

     MR. YONAN:  Your Honor, may I publish for the witness

Government Exhibit 601.

THE COURT: Yes.

BY MR. YONAN:

Q. Sir, do you see Government 601 in front of you?

A. Yes.

Q. It's a two-page document.

Do you recognize it to be -- first of all, let me ask you, this is -- where did you obtain Government Exhibit 601?

A. This is from the phone from the Facebook Messenger messages.

Q. And can you tell us about what that means, face -- Facebook Messenger?

A. It's just within the Facebook's app that has the Messenger part where you can message friends and have conversations through that portal.

Q. Does this appear to be a true and accurate copy of a document you obtained from the Facebook Messenger from the phone?

A. Yes.

MR. YONAN: Your Honor, we would move to admit Government Exhibit 601.

THE COURT: Exhibit is received in evidence.

(Government's Exhibit No. 601 received in evidence.)

BY MR. YONAN:

Q. And can you describe for the ladies and gentlemen, Special

Agent Adams, what you see in the bottom part of the document?

A. It appears to be Border Patrol agents at a vehicle.

Q. Who is sending this?

A. Juan Espinoza.

Q. What is the date and time he's sending it?

A. 9/26/2025 at 2012 hours -- hundred hours.

Q. And what's on the next page of the document?

A. Underneath the video, it says: I do not own video, exclamation point, exclamation point. 1:00 p.m. Cicero and 31st.

Q. And can you tell any of the writing on the bottom of the first page of that document?

A. It says: ICE on Cicero by 31st Street.

MR. YONAN: Your Honor, may I publish for the witness Government Exhibit 604?

THE COURT: Yes.

BY MR. YONAN:

Q. Do you see Government Exhibit -- do you see Exhibit 604 in front of you?

A. Yes.

Q. I'm going to scroll through that. It's six pages.

Does that appear to be a true and accurate copy of a message that was obtained from the phone, defendant's phone in this case?

A. Yes.

MR. YONAN: Your Honor, we would move to admit Government's Exhibit 604, as well as 604T, the translated version of that.

THE COURT: Exhibits are received in evidence.

(Government's Exhibit Nos. 604 and 604T received in evidence.)

MR. YONAN: Permission to publish Government Exhibit 604.

THE COURT: Yes.

BY MR. YONAN:

Q. Sir, I'm going to take you to the third page of the document and ask you -- let me first ask you, what's reflected from the blue bubbles as compared to the gray bubbles?

A. The blue bubbles will be the sender from the device, Juan Espinoza Martinez phone, and then the gray will be the respondent.

Q. So can you read for the jury the three bubbles that are listed on Government Exhibit 604?

A. Yes.

It says -- from Juan Espinoza, it says: Where the brothers at, exclamation point, question mark, question mark, question mark, to which the respondent says: Are you serious, period, period. No one's out there. No one's out, to which then: No one, bro.

Q. What is the date and -- and time that these messages are

being sent?

A.   10/4/2025 at 2128 hundred hours.

Q.   Could you read the next two bubbles?

A.   Yes.

        Juan Espinoza Martinez replies:  I just texted Bobby.
Told HOM WTF.

Q.   I'm going to move to the fourth page.

        Can you read the bubble there in blue?

A.   Yes.

Q.   What does it say?

A.   Juan Espinoza Martinez replies:  It's BS.

Q.   What appears to be contained at the bottom of that page?

A.   A screenshot from another message from another individual
by the name Diego D. Rodriguez of the words:  Where is my SH
brothers at.  Be on point, brothers.

Q.   What's reflected at the top?

A.   ICE out here and it's deserted, deserted out there, dude.

Q.   Following that screenshot, are there -- what's reflected
following the screenshot?

A.   Just so you see that I don't give a fuck about life.

Q.   And who is that from?

A.   Juan Espinoza Martinez.

Q.   That is the blue bubble?

A.   Yes.

Q.   Can you walk us through the last three remaining bubbles on

this exhibit?

A.   Yes.   They're all from Juan Espinoza Martinez phone.

You need balls for this.

I need you or my CUZ.

And then:   Diablo.

MR. YONAN:   Your Honor, may I publish just for the witness Government Exhibit 605?

THE COURT:   Yes.

BY MR. YONAN:

Q.   Sir, I'm showing you what's been marked as Government Exhibit 605.   It is a six-page document.

Do you recognize that exhibit?

A.   Yes.

Q.   What do you recognize it to be?

A.   A text thread from the phone.

Q.   Where was this obtained from?

A.   From the cellular device.

Q.   And does it appear to be a true and accurate copy?

A.   Yes.

MR. YONAN:   Your Honor, the government would move to admit 605 into evidence.

THE COURT:   The exhibit is received in evidence.

(Government's Exhibit No. 605 received in evidence.)

MR. YONAN:   I would also move to admit 605T which contains translations.

THE COURT: Yes, received.

(Government's Exhibit No. 605T received in evidence.)

THE COURT: You may publish.

MR. YONAN: Permission to publish Government Exhibit 605.

THE COURT: Yes.

BY MR. YONAN:

Q. I'm going to take you to the second page of the document, sir, and ask you what's the date? What does this appear to be?

A. A screenshot of messages between another individual.

Q. What's the date?

A. 9/17/2025.

Q. Can you read the portions that's reflected on the screen?

A. Yes.

Yo, yo, ICE on 23 and Central Park. Tell them boys kick them da fuck out, scaring kids and shit.

Q. Can you read the continuation of that message?

A. Bet, bet, IMA tell da guys, bitch ass MFS we on that. We RDY blow at dem bitch ass N word what car that blue Expedition?

Yeah, and then a photo.

Q. What's reflected on the fourth page of that exhibit?

A. The photograph of a blue Expedition and a male standing outside of it, and then the words bet, and then emojis following.

Q. What about on the fifth page of the document?

A.   The screenshot between Diego D. Rodriguez.

Q.   Can you read the bottom portion of that?

A.   Yeah.

     Where is my SH brothers at.  Be on point, brothers.
ICE out here, and it's deserted, deserted out there, dude.

     MR. YONAN:  Your Honor, may I publish for the witness
Government Exhibit 607?

     THE COURT:  You may.

BY MR. YONAN:

Q.   You recognize Government Exhibit 607, sir?

A.   Yes.

Q.   What is Government Exhibit 607?

A.   Text messages from the phone.

Q.   Does this appear to be a true and accurate copy?

A.   Yes.

     MR. YONAN:  Your Honor, the government would move to
admit Exhibit 607 and 607T into evidence.

     THE COURT:  The exhibits are received in evidence.

  (Government's Exhibit Nos. 607 and 607T received in
evidence.)

     MR. YONAN:  Permission to publish 607T.

     THE COURT:  Yes.

BY MR. YONAN:

Q.   Do you see Government Exhibit 607T in the screen in front
of you, sir?

A.   Yes.

Q.   All right.  What is the date -- well, what is reflected in 607T?  Let me ask you that first.

A.   It's a top of an image from the *Chicago Tribune* on 10/3/2025 at 03100 hours.

Q.   And where -- where is this being sent from?  Who is sending this?

A.   Juan Espinoza Martinez phone.

Q.   What's on the second page of that document?

A.   A photograph of Gregory Bovino and then:  Call me.

Q.   What's reflected on the bubble at the bottom?

A.   Call me.

Q.   What is the time and the date of that?

A.   10/3/2025 at 032 hundred hours.

         MR. YONAN:  Your Honor, may I show for the witness only Government Exhibit 608?

         THE COURT:  Yes.

BY MR. YONAN:

Q.   Sir, do you recognize Government Exhibit 608, and I will scroll through that for you.  There's nine pages to Government Exhibit 608.

         You recognize that document?

A.   Yes.

Q.   What do you recognize it to be?

A.   A text thread from the phone.

Q.   Does it appear to be a true and accurate copy?

A.   Yes.

     MR. YONAN:  Your Honor, the government would move to admit Government Exhibit 608, as well as 608T into evidence.

     THE COURT:  The exhibits are received in evidence.

     (Government's Exhibit Nos. 608 and 608T received in evidence.)

     THE COURT:  You may publish.

BY MR. YONAN:

Q.   Sir, how does this string begin?

A.   Yup.

Q.   Let me go back for a second.

     Who are -- what are the display names for this message?

A.   Cody adjustable plug and a local user which was the device.

Q.   What's contained on the second page of that document?

A.   Photograph of Gregory Bovino.

Q.   What is the -- the second bubble on the third page?

A.   A screenshot that was sent.

Q.   What -- what does it say?

A.   It's from Juan Espinoza it appears, and it says:  Yes, I said that.  Feed them pigs.  They love Mexican food.

Q.   What is the time and the date of that message?

A.   10/4/2025 at 0145 hours.

Q.   I'm going to go down to the message at the bottom here

which I will highlight.

What's the time and date of that message?

A.   10/4/2025 at 0145 hours.

Q.   What is said in that message?

A.   LOL, I don't give two FUKS, LMAO.

Q.   And what color is that bubble?

A.   Blue.

Q.   Can you read the next three bubbles?  There's one blue followed by a gray and then a blue.

A.   Yes.

Take them pigs some beans, cheese, and handmade tortillas.

Fuck dem MFS FR.  I hate them ICE MFS.

I told them, feed them pigs.

Q.   What is the message underneath?

A.   A screenshot from what appears, Juan Espinoza.

Q.   What does it say?

A.   They in for a treat in Chicago now.  Happy Halloween cocksuckers.

And then a repost from Donald Trump for President: Breaking:  Federal agents have just shot a woman who was armed with a handgun in the Brighton Park neighborhood of Chicago after she was among multiple vehicles which rammed ICE and Border Patrol agents.

Q.   Can you read the messages I've highlighted, the first being

gray and the second being blue?

A.   Yes.

          Damn MFS tried -- tired of them.

          Yup.

Q.   I'm going to move on to the seventh page of this exhibit.

          First let me ask you to again orient us to the time and the date of these messages.

A.   Yes.  It's 10/4/2025 at 2012 hundred hours.

Q.   Can you read the messages in blue?

A.   Yes.

          It's going down, bro.

          My guys are ready in the vill.

Q.   And can you read the next three messages that are on the screen?

A.   Yes.

          Damn, what they on?

          BS.

          They haven't taken none from the vill.

Q.   And for the record, the later two messages are in blue; is that correct?

A.   Correct.

Q.   And then can you also read the final three messages?

A.   And they won't.

          Kings on they ass and they scared.

          Chapo has our back, bro.  If they -- they take one

it's gonna be bad.

Q. What color are those messages in?

A. Blue.

Q. Now, 608, Agent Adams --

MR. YONAN: Your Honor, may I publish what's already been admitted in evidence as Government Exhibit 301?

THE COURT: Yes.

BY MR. YONAN:

Q. 301 appears to be with this individual named cody adjustable plug; is that right?

A. Yes.

Q. And 608 --

MR. YONAN: If I may publish 608 again, Your Honor.

BY MR. YONAN:

Q. -- that is with this individual cody adjustable plug?

A. Yes.

Q. Does it appear to have the same picture as 301 at the beginning?

A. Yes.

MR. YONAN: Your Honor, may I publish for the witness only Government Exhibit 609?

THE COURT: Yes.

BY MR. YONAN:

Q. Sir, I'm going to show you what's Government Exhibit 609. It's a five-page document that I will scroll through.

Do you recognize that document?

A. Yes.

Q. What is that document?

A. A text message thread from the phone.

Q. Does it appear to be a true and accurate copy?

A. Yes.

MR. YONAN: Your Honor, the government would move to admit Government Exhibit 609 and 609T into evidence.

THE COURT: The exhibits are received in evidence.

(Government's Exhibit Nos. 609 and 609T received in evidence.)

MR. YONAN: And permission to publish Government Exhibit 609T.

THE COURT: Yes.

BY MR. YONAN:

Q. So first, sir, what is the message that appears on the first page?

A. It says -- a screenshot that states: ICE launches Operation Midway Blitz in honor of Katie Abraham to target criminal illegal aliens terrorizing Americans in sanctuary Illinois.

Q. What's the date of the message?

A. 9/8/2025.

Q. What's reflected on the second page?

A. It then has a caption over it: Chicago - Today the

Department of Homeland Security announced Operation Midway Blitz --

COURT REPORTER: Read slower.

THE WITNESS: Oh, sorry.

BY MR. YONAN:

Q. And can I -- I'll just have you -- can you just read the -- the portion that's in the bubble?

A. Yes.

Get to work, fuckers. What about all these racist fuckers doing shit go innocent PPL. Yes, dude was in the wrong, but don't fuck around with our people over him. He is paying. Leave us alone.

Q. And do there appear to be other -- well, what appears to be on the third page of the document?

A. A blue vehicle with a male standing next to it.

Q. And is -- what is that? Is that a screenshot?

A. Yes.

Q. And then what's on the fourth page of the document?

A. A screenshot between Bby Spooks D27.

Q. What's the date of that?

A. 10/4/2025.

Q. And this is a document you previously read into the record; is that right?

A. Yes.

Q. And it continues onto the fifth page; is that right?

Adams - cross

130

A.   Yes.

          MR. YONAN:   May I have a moment, Your Honor?

          THE COURT:   Yes.

     (Counsel conferring.)

          MR. YONAN:   Thank you, Your Honor.   I have no further questions.

          THE COURT:   All right.

                    CROSS-EXAMINATION

BY MR. BEDI:

Q.   Good afternoon, Agent Adams.

A.   Good afternoon.

Q.   We just heard about some of the things you recovered from Mr. Espinoza Martinez's phone.   Do you remember that?

A.   Yes.

Q.   I want to talk about some of the ways that you were able to get this.

          So if you were to look at 402.

     (Counsel conferring.)

          MR. BEDI:   Judge, could we have that published to the jury?

          THE COURT:   Yes.

BY MR. BEDI:

Q.   So this is the front part of the Snapchat message of 402; is that correct?

A.   Correct.

Adams - cross

131

Q.   And so we have some information here at the -- at the top.
We have the number of participants, correct?

A.   Correct.

Q.   And then we have the display names, correct?

A.   Correct.

Q.   And then there's the number of messages?

A.   Correct.

Q.   And then we have the first message sent date and time and
last message sent date and time, correct?

A.   Correct.

Q.   And so then it's UTC.  That means in the top right of the
sent messages, that's the time but in UTC, correct?

A.   Correct.

Q.   And so when this here says 10/3/25 at 0015, that's not
midnight, correct?

A.   Correct.

Q.   And what is UTC in Central Time?

A.   I wouldn't know off the top of my head.

Q.   Okay.  Is it -- is it correct that it varies six to seven
hours depending?

A.   Yes.

Q.   Okay.  And so these timestamps aren't really accurate.
They're six or seven hours off.  Fair?

A.   Yes, from Central Time.

          MR. BEDI:  Judge, could we take that exhibit down,

Adams - cross

132

please?

THE COURT: Yes.

BY MR. BEDI:

Q. Well, you said that, for example, in 402 there's a number of messages that go back and forth between the sender and Mr. Martinez, but they're not 68 messages, correct?

A. Correct.

Q. And so you talked about tagged items. Do you remember that?

A. Yes.

Q. And who determines what those tags are?

A. Well, it's based on the evidentiary aspect. So I tag the items.

Q. Right. So you tag the items?

A. Yes.

Q. Okay. So you determine what is in the exhibit, correct?

A. Yes.

Q. Okay. So 402 is developed by you based on your tags. Fair to say?

A. Correct.

Q. Okay. So 402 goes through, and there's a back and forth between Mr. Martinez and the O sender, correct?

A. Correct.

Q. And then if you look at the end, the first message in your tags is 10/3/25 at 15, and then the gun picture is at 10/3/25

at 2035, correct?

A.   Correct.

Q.   So what's the time difference between a 10/3/25 0015 and a 2035 on 10/3?

A.   You're making me do math in public now?

Q.   I -- I am.

A.   Quite a few hours.

Q.   Quite a few hours.  And this 40 -- 402 does not complete all the messages that were sent between the two senders from 10/3/25 at 15 to 10/3/25, 2035, correct?

A.   Correct.

Q.   There are other messages that you didn't include in this.

A.   Correct.

Q.   And that's because they weren't -- those other messages don't fit with your tags or your theory, correct?

A.   With the evidentiary aspect, yes.

Q.   And so you kind of put aside the messages that don't go along with what you wanted the -- the text message chain to say, correct?

         MR. YONAN:  Objection, Your Honor.  And I would ask to address the Court at sidebar.

         THE COURT:  All right.

     (Proceedings heard at sidebar:)

         MR. YONAN:  So, Your Honor, I object.  I don't think that's a fair characterization.  I did not want to get in front

of this -- into this in front of the jury, but this is pursuant to a search warrant. And the agent is limited in what he can tag or otherwise known as seize from the material based on the terms of the search warrant. So to the extent that they're going to be arguing, you're pulling stuff that fits your evidentiary theory of the case, I don't think that's a fair characterization. And if that testimony is going to go forward on cross, I'm going to go up on redirect and ask him what -- you know, you obtained a search warrant; you were limited on what you can seize based on that search warrant.

So I don't think it's a fair characterization.

THE COURT: Okay.

MR. BEDI: Judge, I don't think it's a characterization. It's cross-examination. He can just say -- I mean, he agreed with me. He said that there were things in the chat history that weren't there. So...

THE COURT: Okay. But we're going down a road on redirect then that --

MR. BEDI: Judge, I'll move on.

THE COURT: Okay.

MR. BEDI: I'll move on.

(Proceedings heard in open court:)

MR. BEDI: Thank you, Judge.

BY MR. BEDI:

Q.   Now, turning your attention to 405. There is kind of the

same information there about -- at the top of -- of 405 about the details of the number of messages, the date, the time, all of the things that Mr. Yonan just went through, all of those exhibits have that information at the top. Is that fair to say?

A. Correct.

Q. Okay. And some of them, if they are -- if the exhibit is a text message, that may not be in UTC, that might be in local time. Is that fair?

A. Without seeing it in front of me, I can't tell you for sure.

Q. Okay. Well, how about this: So if it's in UTC, it would say at the top, correct?

A. Yes.

Q. And if it's in Central Time, it would say at the top?

A. Correct.

Q. Just to save a little bit of time. Okay.

And when you -- how long have you been a police officer -- or an agent?

A. A little over a year.

Q. A little over a year?

A. Yes.

Q. And you were in law enforcement before that, you said, in Markham?

A. Yes.

Q.   And for a year?

A.   A year and four months, approximately.

Q.   So did you have any law enforcement experience before that?

A.   No.

Q.   So now, see, I'm doing math in public again.  So it's about two and a half years?

A.   Approximately.

Q.   And you went to the academy?

A.   Yes.

Q.   And you were engaged in the interrogation and questioning of -- of Mr. Espinoza Martinez as well, correct?

A.   Yes.

Q.   And up until that questioning, how many investigations, both subjects, witnesses, and targets, would you say you were involved in?

A.   Quite a few.

Q.   We're going to do this again.  If you had to ballpark it, 50?

A.   Probably under that.  Slightly under that.

Q.   So the total amount of people you interviewed, maybe 35, 40?

A.   Witness and suspect or everybody?

Q.   Everybody.

A.   Oh, over 50.

Q.   Okay.  So it's fair to say you have a fair amount of

experience in asking questions and getting responses?

A.   Correct.

Q.   And interrogating witnesses?

A.   Interviewing, but correct.

Q.   Okay.

          MR. BEDI:  Judge, may I have a moment?

          THE COURT:  Mm-hmm.

          MR. BEDI:  Judge, we have nothing further.

          THE COURT:  All right.

          MR. YONAN:  I just have two real quick questions.

                    REDIRECT EXAMINATION

BY MR. YONAN:

Q.   You were asked some questions about the UTC to Central Time Zone I guess flip, so to speak.  And -- and I believe counsel characterized the timestamps as not accurate.  That's -- is that -- is that the case?

A.   They're accurate, just different from Central Time.

Q.   It's in -- it's in UTC?

A.   Correct.

Q.   All right.  And you were asked the -- on Government Exhibit 402 --

          MR. YONAN:  May I publish 402, Your Honor?

          THE COURT:  Yes.

BY MR. YONAN:

Q.   The first message in 402 is listed as -- what is the --

what is the time and the date on the first message of 402?

A.    10/3/2025 at 015 hundred hours.

Q.    And then the last message contained on the exhibit, what is the time and the date?

A.    10/3/2025 at 2035 hundred hours.

Q.    All right.  And I think your answer to that question from counsel was it was quite a few hours, is that correct, between those messages?

A.    Yes.

Q.    Would that still be within the same day?

A.    Off UTC time, I couldn't tell you exactly off the top of my head.

MR. YONAN:  Thank you.  No further questions.

THE COURT:  All right.

MR. BEDI:  Nothing based on that, Judge.

THE COURT:  All right.  Then you're excused, Agent.

THE WITNESS:  Thank you.

THE COURT:  Thank you for your testimony.

Are you all ready for a break, or should we go on for a while?

MR. YONAN:  Your Honor, I have two stipulations to read real briefly.

THE COURT:  Uh-huh.

MR. YONAN:  If I could do that now.

THE COURT:  Yes.

MR. YONAN: Stipulation No. 1: The Apple Model 16 cellular telephone assigned to telephone number 312-489-7040 and bearing serial number K72KXP705 marked as Government Exhibit 501 and Snapchat are each a facility of interstate commerce.

Stipulation No. 2: The laws of the state of Illinois and the United States each prohibit murder.

So stipulated as to both?

MR. BEDI: So stipulated.

THE COURT: Do you have another witness?

MR. SHIN: If you could just give us one moment, Your Honor.

THE COURT: Okay.

(Counsel conferring.)

MR. SHIN: Your Honor, the government rests its case.

THE COURT: All right then.

We'll take a recess, 15 minutes.

THE CLERK: All rise.

(Jury out at 2:27 p.m.)

THE COURT: All right.

THE CLERK: Court is in recess.

(Recess at 2:27 p.m., until 2:43 p.m.)

(Proceedings heard in open court; jury out; defendant present:)

THE CLERK:  All rise.

THE COURT:  We'll get the jury.  You may sit down if you like and stand up again.

MR. BEDI:  Just one -- one issue before we bring out the jury.

THE COURT:  Oh, all right.

MR. BEDI:  We have a motion for a directed finding. We'd ask that your Honor enter a finding of not guilty at this point.  It's in the light most favorable to the non-moving party.  Even if all the government's evidence is believed, they haven't sustained their burden as to the element of intent. I'd ask that you grant our motion.

THE COURT:  Are you prepared to respond or shall I --

MR. SHIN:  I can respond now or at a later time, your Honor.

THE COURT:  Okay.  Make a record of -- just the issue of intent.

MR. SHIN:  Make a record and then --

THE COURT:  Of what your position is on the intent.

MR. SHIN:  Our position --

COURT REPORTER:  I'm sorry.  Could you use the microphone?

MR. SHIN:  Our position is that there is sufficient

evidence in the government's case. When the evidence is viewed in the light most favorable to the government, the element of intent was established.

Would you like me to continue and make a Rule 29 argument now?

THE COURT: Give me a fact or two.

MR. SHIN: Sure.

THE COURT: Well, we have the one video screenshot -- hold a minute.

MR. SHIN: Sure. Your Honor, I would start with what's on the face of messages that came in as Government Exhibits 201 and Government Exhibits 402. Those were Snapchat messages to the source and o_espinoza12, respectively. They contained specific information, a specific monetary incentive, the action incentivized, and the photograph of the same individual. Certainly even on the face of those messages and the specific information contained in them, a jury can infer that that information was sent with the intent that the solicited action occur.

The choice of the medium also is a feature, involves features which include disappearing messages. The fact that the defendant used that medium, Snapchat, in both solicitations is circumstantial evidence of his consciousness of guilt and understanding that what he was sending was incriminating. And viewed in the light most favorable to the government, the jury

can infer that if he did not think that sending a message had that incriminating intent, he could have sent it over other mediums if he truly did not mean it as a joke.

THE COURT: I'll deny the motion without prejudice to renewal.

I need to speak to the defendant about his right to testify or --

MR. BEDI: Judge, before we do that, we're going to call Oscar Martinez to the stand.

THE COURT: Okay, good. We'll take a recess then because -- would you tell them to bring in the jury?

(Pause.)

THE CLERK: All rise.

(Jury in at 2:47 p.m.)

THE COURT: Please be seated.

MR. BEDI: Defense calls Oscar Martinez, please.

(Witness enters the courtroom.)

THE COURT: Good afternoon.

THE WITNESS: Good afternoon.

THE COURT: Raise your right hand to be sworn.

(Witness sworn.)

OSCAR ESPINOZA, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. BEDI:

Q. Good afternoon.

Espinoza - direct

A.   Good afternoon.

Q.   In a loud, clear voice, could you please state and spell your name?

A.   Oscar Espinoza.  O-S-C-A-R.  E-S-P-I-N-O-Z-A.

Q.   Do you know Juan Espinoza Martinez?

A.   Yes.

Q.   How do you know him?

A.   He's my brother, older brother.

Q.   He's your older brother?

A.   Yes.

Q.   So you've known him --

A.   I've known him for 28 years.

Q.   Because you're 28 years old.

A.   I'm 28 years old, yes.

Q.   Okay.  And do you know if he works?

A.   Yes.  He's a union carpenter.

Q.   Okay.  Does -- tell me about -- tell the Court about his family situation.

A.   He has three kids.  Lives with his three kids and his wife. He's always with his kids.  After work, he goes home to his family.

Q.   Okay.  Turning your attention to October of 2025, do you remember that kind of time frame?

A.   Yes.

Q.   In early October in the Little -- area of Little Village in

Chicago, just very briefly, do you -- do you remember what was going on then?

A.   Yes.  A bunch of protests, Homeland Security beat them.  It was getting pretty bad in the neighborhood.

Q.   Are you on social media?

A.   Am I on social media?  Yes.

Q.   Do you have a Facebook account?

A.   Yes.

Q.   And Snapchat?

A.   Yes.

     (Counsel conferring.)

BY MR. BEDI:

Q.   Do you see that on your screen?

A.   Yes.

     MR. BEDI:  Your Honor, I think this has already been admitted and published.

     Can we publish, publish it to the jury?

     THE COURT:  Any objection?  It has been admitted.  Okay.  Yes.

     (Counsel conferring.)

BY MR. BEDI:

Q.   Do you recognize this -- this chat?

A.   Yes.

Q.   And on the top, it says the display name.  And then it's an "O" and an underscore.

Espinoza - direct

Is that you?

A.   Yes.

Q.   Okay.  And so is it fair to say that Juan sent this to you?

A.   Yes.

Q.   And do you recognize this?

A.   Yes.

Q.   And did Juan send this to you?

A.   Yes.

Q.   Had you seen this picture or this post prior to Juan sending it to you?

A.   Yes.

Q.   Where did you see it?

A.   I saw that post on Facebook before he had sent it over to me.

Q.   Okay.  And how -- how long had you -- had you seen that?

A.   Maybe about an hour, hour and a half.

Q.   And if you remember, what did that post on Facebook --

A.   It was a screenshot of that same picture and same words under, 10,000 and 2,000, for information.

Q.   Okay.  And so when you received this -- he writes "10,000 dead or alive, shit serious."

And you write what?

A.   "Mames."

Q.   Which means?

A.   It can mean a lot.  It can mean like -- like that's fake,

Espinoza - direct

or would be like BS.

Q. Okay. When he sent that to you, did you think -- what did you think when he sent that to you?

A. I just thought it was like -- he was just showing me was what they were saying.

Q. Okay. Are you -- what do you do for a living?

A. I'm a union carpenter as well.

Q. Do you commit murder-for-hires?

A. No.

Q. Do you kill people for money?

A. No.

Q. Okay. And this is over Snapchat?

A. Yes.

Q. Is that an unusual way for you and your brother to communicate?

A. No.

Q. Do you know if he communicates with other people like that?

A. On -- I know he communicate with through Snapchat.

Q. Okay. And do you talk about -- do you use Snapchat?

A. I use Snapchat, yes.

Q. So it's not uncommon to use Snapchat.

A. No.

Q. Now, a little further down, there's further conversation, and you write "Not worth 10K."

A. Yes.

Espinoza - direct

Q. So what did you mean when you wrote "Not worth 10K"?

A. I just -- I meant to, like, nobody is going to do it for 10K, it's a joke.

Q. Okay. So you took it as a joke.

A. Yes, I took it as a joke.

Q. But you had already seen the chat before.

A. Yes.

Q. And so just to be clear, on the Facebook chat that you originally saw, Juan didn't post that.

A. No, he did not.

Q. Do you remember who posted that?

A. I do not.

Q. And did you ever -- at any time ever go back and look to try to find that?

A. Yes, I did.

Q. And that was shortly after you and I had our first conversation.

A. Yes. And it was after I seen it on the news.

Q. After you saw this on the news.

A. Yes.

Q. And after you and I talked.

A. Yes.

Q. You went on Facebook to try to find it.

A. Yes.

Q. And did you have any luck finding it?

A.   No, I did not.

Q.   Okay.  Now, this next communication, this is from you to Juan or Juan to you?

A.   That's from Juan to me.

Q.   Okay.  Why -- why did he send this to you, if you know?

A.   Because my wife isn't documented.  My family was documented who would take the kids to school, so he was just letting me know what he has read on Facebook.

Q.   Okay.  So you said that your wife is not documented?

A.   Yes.

Q.   And at that time in October, did you have concern about that?

A.   Yes.

Q.   And so he was sending this to you as a way -- as like a resource for you --

A.   Yes, to let her know just to be careful or to not send the kids to school, because she has little siblings she would take to school.

Q.   And so that's why, underneath that, he says, "Kids want to go to school," and you respond, "Kids are okay, though."

A.   Yes.

Q.   And then what is his response to you when you say, "Kids are okay"?

A.   He said -- well, before that, it had something -- just be careful, and then -- that's when said -- yeah, they're not

asking them if you're legal or not legal, they're just grabbing people.

Q. And so what did you mean that -- what did you understand that to mean?

A. Well, they were just, how do you -- racial profiling.

Q. Okay.

A. That's how I -- that's how I understood the whole message.

Q. So in the course of this conversation, at this point where the immigration lawyer communication is, are you still talking about Bovino?

A. No.

Q. So is it fair to say that the Bovino conversation has ended at this point?

A. Yeah, Bovino never came back up.

Q. Okay. And so it was just those first couple lines --

A. Yes.

Q. -- about him telling you what was on Facebook.

A. Yes.

Q. Is that fair?

A. That's fair.

Q. Now, "Show Karla for her bros n sis," that's at 10-03-25 at 1:27, right?

A. Yes.

Q. And then there's a -- kind of a large gap in time.

The next text in Government's 402 is 10-3-25 at 20:35;

Espinoza - direct

is that right?

A. Yes.

Q. Were there other communications between you and your brother in this -- between that time frame?

A. Yes.

Q. And do you remember what those communication --

MR. SHIN: Objection. Calls for hearsay.

THE COURT: Yes. I assume.

MR. BEDI: If he remembers what they were, that doesn't call for hearsay. That's a yes or no question.

THE COURT: That's true.

You may answer that.

BY THE WITNESS:

A. Yes, it was a --

THE COURT: Wait.

MR. BEDI: Can I keep going?

THE COURT: Well, the content of the conversation, is it hearsay --

MR. BEDI: I'm not going to ask about the content.

THE COURT: Oh, okay.

BY MR. BEDI:

Q. Was it communication? Was it video? Was it picture?

A. Video and picture.

Q. Okay. And were the video and pictures, did they have anything to do with Bovino?

Espinoza - direct

A.   No.

Q.   Did they have anything to do with immigration or ICE?

A.   No.

Q.   And do you remember how many there were?

A.   Two.

Q.   Okay.  And you don't remember the specific times, but they were between the "show Karla for her kids" and the picture of the -- of the gun?

A.   Yes.

Q.   And at that point when you were getting the picture and the video, you weren't talking about Bovino.

A.   No.

Q.   All right.  So let's talk about the end of this picture -- or the end of this chat.

So here's a picture that has a picture of a gun, correct?

A.   Correct.

Q.   And it says on the next page:  "Available 1500 discount price."

A.   Yes.

Q.   And he sent that to you.

A.   Yes.

Q.   Why would he send you a picture of a gun available for $1500?

MR. SHIN:  Objection.  Calls for speculation.

Espinoza - direct

THE COURT: Sustained.

BY MR. BEDI:

Q. Why did you think you received that?

A. I was looking for a gun with that design in it.

Q. Okay. That design -- what is that design?

A. St. Jude.

Q. Why were you looking for a picture of St. Jude?

A. St. Jude is our -- patron saint in our family.

Q. When you say St. Jude is our patron saint, what does that mean?

A. So we believe in him. We're Catholic. We believe in him. And I -- we have -- my dad a couple years ago was going through kidney failure. He had a mini stroke. I started praying to him. Our family started praying to St. Jude. He started getting better. He was able to get a kidney transplant. And, yeah, after that, it's -- he's just been our -- like our best friend, pretty much, you could say.

Q. And at that time, did you have a FOID?

A. Yes.

Q. And explain what a FOID is.

A. A FOID is a permit in Illinois to be able to buy guns.

Q. So it's a Firearm Owners Identification --

A. Yes.

Q. -- document. Or card.

And did you also have a Carry and Conceal?

Espinoza - cross

A.   I did.

Q.   Did you understand this -- this gun text to be that Juan had the gun?

A.   No.

Q.   Or that he was sending it, that somebody else had the gun?

A.   He said somebody else had the gun.

Q.   Okay.  In your mind, when you received this -- this screenshot from Juan, did this have anything to do with Bovino?

A.   No.

Q.   Did it have anything to do with ICE?

A.   No.

Q.   Immigration?

A.   No.

Q.   It was only because it had a St. Jude in the handle.

A.   Yes.

     (Counsel conferring.)

          MR. BEDI:  Thank you, Judge.  I have no further questions.  I tender the witness.

          MR. SHIN:  May I begin, your Honor?

          THE COURT:  Yes.

                    CROSS-EXAMINATION

BY MR. SHIN:

Q.   Good afternoon, sir.

A.   Good afternoon.

Q.   The defendant in this case, Juan Espinoza Martinez, is your

Espinoza - cross

brother, correct?

A.   Correct.  Older brother, yes.

Q.   And he's family; isn't that right?

A.   Correct.

Q.   And you don't want to see your brother go to prison, do you?

A.   Correct.

Q.   Would that be his first time in prison?

A.   Yes.

Q.   You wouldn't want that for his family or his three children either; isn't that right?

A.   No.

Q.   So you're testifying here today because you want to help your brother out; isn't that right?

A.   I'm testifying to, like, yes, because I'm telling the truth of my brother.

        MR. SHIN:  Your Honor, if we can publish Exhibit 402T again.

        THE COURT:  Yes.

BY MR. SHIN:

Q.   This is a Snapchat conversation between you and your brother; isn't that right?

A.   Yes.

Q.   Now, I want to direct your attention to the first photograph on the screen here, continuing to the next page.

That's a screenshot, right?

A. Yeah, that is a screenshot.

Q. That's a screenshot that your brother took; isn't that right?

A. Yes.

Q. So he took the time to find where that picture was, took a screenshot and sent it to you; isn't that right?

A. On that one, it was a screenshot he -- he saw on his news feed on Facebook.

Q. But he took a screenshot of that.

A. He took a screenshot, yes.

Q. He didn't send you the link to it, right?

A. There's no links on Facebook. It's a screenshot. When somebody else posts it, it's a screenshot.

Q. And earlier you testified that you had saw -- seen this "information 10K for his head" on Facebook --

A. Yes.

Q. -- isn't that right?

A. Correct.

Q. But then later on you said that when you went to look for it, you couldn't find it; isn't that right?

A. Correct.

Q. And your brother, when he took the screenshot, took a screenshot of this man; isn't that right?

A. Yes.

Espinoza - cross

Q. Do you know who this man is?

A. Yes.

Q. Who is this man?

A. Bovino.

Q. And your brother wrote to you right under that photograph "10K for his head."

That's what he wrote, right?

A. Yes.

Q. And he sent that on October 3rd at 00:16; isn't that right?

A. I don't remember the time he sent it.

Q. Well, that -- is that what it says on the screen there?

A. Okay, yes.

Q. Showing you the next page.

A. Yes.

Q. Still at 00:16, he then writes: "Shit serious." Isn't that right?

A. Yes.

Q. That's what he said.

A. Yes.

Q. That's what he said, isn't it?

A. Correct.

Q. He didn't say it was a joke, was it?

A. No.

Q. And then you respond "mames," right?

A. Yes.

Q.   You did not write back, "Ha ha, very funny," did you?

A.   "Mames" is in like, mames, type of thing.

Q.   Well, I'm not saying what you wrote.  You did not write back "Ha ha, very funny" --

A.   No.

Q.   -- did you?

You didn't write back "Stop playing," did you?

A.   No.

Q.   And then your brother responded, "They're on fire with the top pig."

That's what he said, right?

A.   Yes.

Q.   And when he's saying "They," he's referring to the Latin Kings; isn't that right?

A.   I don't know.

Q.   But when he's referring to "the top pig," he's talking about Bovino, isn't he?

A.   I don't know.

Q.   He sent that at 0:17; isn't that right?

A.   Yes.

Q.   What about that picture of Bovino?  He sent that at 0:15, right?

A.   Yes.

Q.   So he's referring to a "top pig" two minutes after he sent this photograph; isn't that right?

A.   I guess so, yes.

Q.   And your testimony is that you don't know who he's referring to?

A.   I didn't know he called him "top pig."

Q.   You then write back "Not worth 10K."

          That's what you wrote.

A.   Correct.

Q.   And you wrote that because you were trying to talk your brother out of it; isn't that right?

A.   I wrote that because Bovino is not worth 10K.

Q.   Yeah, because you were trying to talk your brother out of it --

A.   No.

Q.   -- because it wasn't worth it; isn't that right?

A.   Not talk him out of it.  He wasn't doing anything.  I just said he wasn't worth 10K.

Q.   You wrote that at 0:17; is that right?

A.   Correct.

Q.   And your brother responded immediately; isn't that right?

A.   Yes.

Q.   And he didn't write "Yeah, I agree with you, it's not worth it."  He didn't say that, did he?

A.   No, he didn't.

Q.   He didn't say "Hey, don't worry about it, I wasn't being serious," did he?

Espinoza - cross

A.   No.

Q.   That's not what he said.

He didn't say "Hey, man, it's just a joke, I didn't mean it that way."  That's not what he said, is it?

A.   No.

Q.   In fact, his response was "Not for many."  Isn't that right?

A.   Yes.

Q.   That's what he said.

You asked -- or you said "Not worth 10K."

And he responded "Not for many."

Isn't that right?

A.   Correct.

Q.   Isn't it true that what he's saying there is that for many people it's not worth 10K, but for some it is?

That's what he's saying there, right?

A.   Yes.

Q.   And he goes on to say:  "But any infor on his whereabouts and if they catch him you can fucking make at least 2 to 3K for info."

That's what he said, right?

A.   Yes.

Q.   So you wrote "Not worth 10K" because you were talking him out of it, right?  That's what you were trying to do.

A.   No.

MR. BEDI:  Objection.  Asked and answered.

THE COURT:  Sustained.

BY MR. SHIN:

Q.  And your brother, he's trying to talk you into why it's -- why part of it is worth it; isn't that right?

A.  No.

Q.  That's not what he's saying?

A.  That's not how I took it.

Q.  I'm not asking how you took it.  I'm asking did he write "But any info on his whereabouts and if they catch him, you can fucking make at least 2 or 3K for info"?

A.  That's what he said, yes.

Q.  He also then wrote "They want to get him in the vill." That's what he wrote, right?

A.  Yes.

Q.  And your brother lives in Little Village; isn't that correct?

A.  Yes.

Q.  So he's saying that it will be easy to do this; isn't that right?

A.  No.

Q.  He's saying this is going to be an easy way to make 2,000 to $3,000; isn't that right?

A.  I don't think so.

Q.  The timestamp here is 10-3-25 at 20:35; is that right?

A.   Yes.

Q.   So that's less than 24 hours than the message we were reviewing before, based on the timestamps?

A.   Yes.

Q.   And your testimony on direct was that you were interested in purchasing a gun around this time; is that right?

A.   Yes.

Q.   And your brother sent you a photograph of a gun for sale at this time and on this date?

A.   Yes.

Q.   Your brother has your phone number; isn't that right?

A.   Correct.

Q.   And you text him -- with him?

A.   Sometimes.

Q.   Do you text with him?

A.   Yes.

Q.   So if he wants to text you, he can text you, right?

A.   Yes.

Q.   And this whole conversation could have happened through a text message.

A.   Yes.

Q.   If that's what he wanted, right?

     But he didn't send this stuff to you over text message, did he?  He didn't send this stuff to you over text message, did he?

A.   No.

Q.   Do you know everything that your brother does online?

A.   No.

Q.   Do you know everybody that your brother talks to on Snapchat?

A.   No.

Q.   Do you know everything that's in your brother's phone?

A.   No.

     (Counsel conferring.)

BY MR. SHIN:

Q.   I want to turn your attention back to Exhibit 402.

     Do you remember on direct you said that you had saw this "10K for his head" post on Facebook?

A.   Yes.

Q.   And you had said you had seen that about an hour before this conversation happened.

A.   Yes, about an hour, hour and a half.

Q.   But when your brother says this to you, your response is "Fuck," isn't it?

A.   Yes.

Q.   So you were surprised by this, weren't you?

A.   No.  "Mames" could mean a lot of things in Spanish.  You list -- well, they translate it as "Fuck," but I didn't -- "mames" isn't "fuck."  I meant "Mames" like --

Q.   You didn't -- sorry.  I didn't mean to cut you off.

A. Yeah.

Q. But you didn't respond, "Yeah, I already saw this," did you?

A. No.

Q. That's not what you responded with.

MR. SHIN: Nothing further, your Honor.

THE COURT: All right.

MR. BEDI: I have some very brief redirect.

THE COURT: Yes.

REDIRECT EXAMINATION

BY MR. BEDI:

Q. Just a couple questions.

A. Yes.

Q. The government started off asking you questions and said that you're Juan's brother.

A. Yes.

Q. Do you remember that?

You don't want anything bad to happen to him?

A. No.

Q. And when you and I were talking, you and I and Dena -- I mean, Ms. Singer -- you, me, Ms. Singer were talking about your testimony, what's the one thing we told you?

A. To tell the truth.

Q. And have you told the truth here today?

A. Yes.

MR. BEDI: I don't have anything further.

THE COURT: All right then. You are excused. Thank you for your testimony.

THE WITNESS: Thank you.

MS. SINGER: (Indicating.)

THE COURT: Sidebar?

MS. SINGER: Yes, please. Thanks, Judge.

(Witness exits the courtroom.)

(Proceedings heard at sidebar:)

MR. BEDI: Judge, with that, the defense rests.

THE COURT: All right. Then I will excuse the jury for a moment. But I still have to advise him, so we'll take a brief recess.

MS. SINGER: Do you want to just advise him at sidebar here, Judge, instead of moving the jury in and out?

THE COURT: I could do that, if you agree to it.

MR. BEDI: I agree to that.

MS. SINGER: That's fine, Judge.

THE COURT: Okay.

So, Mr. Martinez, good afternoon.

THE DEFENDANT: Good afternoon.

THE COURT: I just want to remind you or tell you that you -- you have a right to testify in this case. That is, if you want to get on the witness stand and explain yourself or say anything that your attorneys and you have talked about, you

do have a right to do that. You also, as we've said several times, you have the right to remain silent. You're not required to prove anything.

So have you consulted with your attorneys about this decision?

THE DEFENDANT: Yes.

THE COURT: And you understand it's your decision, not theirs.

THE DEFENDANT: Yes.

THE COURT: Okay. And what is your decision?

THE DEFENDANT: I don't want to testify.

THE COURT: Okay.

MR. BEDI: Do you want me to rest in front of the jury then?

THE COURT: Yes.

MS. SINGER: Thank you, Judge.

(Proceedings had in open court:)

MR. BEDI: Your Honor, thank you. With that, the defense rests.

(Defense rests.)

THE COURT: All right then. Is there any rebuttal testimony?

MR. SHIN: There's no rebuttal case from the government, your Honor.

THE COURT: All right then. So I'm going to excuse

you for the day. And we'll start again tomorrow, let's say at 9:30. Give you a few minutes extra to get here.

The next step will be -- well, I'll instruct you on the law. And then you'll hear from each side of the case, from the lawyers, trying to persuade you to render a verdict in their favor.

With that, I thank you. And let me just make one caution. I understand that you might run into someone in the courtroom, in the hallways. And if you do, I would like to avoid -- I would like to avoid that. So just take the elevator on this end of the building. We'll ask all of the other people to take the elevator on the Adams Street side of the building. That will make it a safer exit for you.

All right. You are excused. Thank you for your attention today.

THE CLERK: All rise.

(Jury out at 3:17 p.m.)

THE COURT: You may be seated.

Are there any other matters before we talk about jury instructions?

MR. BEDI: Your Honor, I renew our motion for -- a motion for judgment of acquittal. At this point, it's a -- beyond a reasonable doubt. Both sides have rested. The government has not met their burden as to the intent element. I'd ask that you enter a judgment of acquittal.

THE COURT: I will deny the motion.

Okay. Have you talked about the jury instructions? Are there any problems we need to address?

I don't even know if I have them. Do I?

MS. SINGER: Could we maybe take like ten minutes, just so we can pull up instructions and make sure your Honor has instructions?

THE COURT: Yes.

MS. SINGER: And then we can just reconvene. I don't think -- the instruction conference I don't think should take -- be that --

THE COURT: Take a 30-minute break. You can -- I'll be here this afternoon. I'll come back for jury instruction conference, let's say at about 10 minutes to 4:00.

MR. BEDI: Thank you, Judge.

MS. SINGER: Thank you, Judge.

THE COURT: Okay.

THE CLERK: All rise.

(Recess at 3:19 p.m., until 3:52 p.m.)

(Proceedings heard in open court; jury out; defendant present:)

THE CLERK: All rise. Court resumes in session.

You may be seated.

THE COURT: All right. Where do we stand on jury instructions?

(audio interruption.)

MR. YONAN:  I'm sorry, your Honor.  That was my fault.

I think we are largely in agreement on instructions.  There's a couple of things I think we both agree that can be removed.

If you have the government's proposed instructions, I can read those to you.

THE COURT:  I do.  Hold on.  I put them in my book.

Here they are.  All right.  I'm ready.

MR. YONAN:  For Government Instruction No. 8, I think the parties agree that you can remove the bracket that says "or present evidence" because the defense did present some evidence in this case.

THE COURT:  Yes.  All right.  I had that marked.

Anything else?

MR. YONAN:  I think the parties agree that you can remove Government's Instruction No. 12, which relates to the translations.  Given that the parties stipulated translations, we don't believe there needs to be an instruction about whether the translations are accurate.

THE COURT:  Good.  So we'll exclude No. 12.  Remove.

MR. YONAN:  For No. 21, your Honor, I submitted a more updated aiding and abetting instruction, which is pattern.  It's 5.06(A).  There are actually two aiding and abetting instructions in the pattern instructions.  I think 5.06(A) is

the more -- is the more prevalent one.  I think it's the more appropriate one to use for purposes of aiding and abetting, so we would propose 5.06(A).

THE COURT:  Do -- does the defense agree to that?

MS. SINGER:  Judge, I believe so.  I am just taking a look at the committee comments because how 5.06(A) is written is the brackets of "aiding, counseling, commanding, inducing, or procuring," I take that to mean that if some of those don't apply, those are stricken.  And so I'm just taking a quick look at the committee notes to make sure all of those should be included or if only some of them, so if I could just have one --

THE COURT:  All right.  Let's see if I can look at it.

MS. SINGER:  Judge, we don't have an objection how it's proposed.

THE COURT:  All right.  So we will give Seventh Circuit pattern general instruction 5.06(A).

Anything else?

MR. YONAN:  Your Honor, I have one more modification. I apologize, I didn't run this by the defense.

In Government Instruction 16, with the elements instruction, there are two elements and then there's sort of the next paragraph that says:  "The government must prove the defendant's use of the facility of interstate commerce was useful to or in furtherance of his murder-for-hire scheme."  We

would propose substituting the word "the" for "his" murder-for-hire scheme because there is an aiding and abetting instruction, so I do think the appropriate usage would be "the" murder-for-hire scheme.

MS. SINGER:  I'll have to take a look.  One moment.

If I can have one moment, Judge?

(Counsel conferring.)

THE COURT:  How about using "a"?

MR. YONAN:  "A" would be fine as well.

MS. SINGER:  I would -- "a" is fine with us.

THE COURT:  Okay.  So the Jury Instruction No. -- what is it, 15?

MS. SINGER:  That one that we were just speaking of?

THE COURT:  16?

MS. SINGER:  That's 16, Judge, yes.

THE COURT:  16?  Not marked.  Okay.  It's No. 16.

MR. SHIN:  Got it, got it.  Okay.

THE COURT:  The second paragraph, that is the paragraph headed by the number 2, last -- anyway, I think the record is clear -- but line -- line 5 of subparagraph 2 says -- the word "his" will be removed and the word "a" will be inserted.

Okay.  The defense -- that was it for you, Mr. Yonan?

MR. YONAN:  The only other thing I would note, Judge, is 5.06(A), the aiding and abetting instruction, sets forth a

page number, so it references back to the elements instruction. I just want to alert the Court that that page may need to be modified because we are eliminating the translation instruction, so just -- we just may need to update that page on 5.06(A) for Government Exhibit -- Instruction 21.

THE COURT:  Okay.

MS. SINGER:  That's right.

THE COURT:  All right.  Does the defense have any proposals?

MS. SINGER:  Judge, I believe we may have filed -- I don't have the docket in front of me, but we do not.  We are withdrawing any proposed defense instructions.

THE COURT:  Right.  I have yours.  One was presumption of innocence.

MS. SINGER:  Right, the presumption, which I think is already included.

THE COURT:  And then witnesses requiring special caution.

MS. SINGER:  I think based on the testimony, we will be withdrawing that.

THE COURT:  Okay, good.  I had just a couple of wording things that I would like you to make.

I'm not sure -- I typically do not give the jury a copy of the instructions when I -- I'm looking at No. 1.  So I'm reading them, although I could have them projected on the

screen. I just don't really have someone who is free to do that. So if you would just say "Each of you will have a copy of these instructions," that would sound better to me.

Okay. Are you agreeing -- is everyone agreeing to No. 11? And there are some bracketed portions there.

MR. YONAN: The government is fine with the bracketed portions, your Honor.

MS. SINGER: I think -- sorry, go ahead, Judge. It seems odd to have both.

THE COURT: Right. It's either/or, I think.

MS. SINGER: Because the bracketed portion seems to say "You are given the transcript of the recordings, the transcript is not evidence," but then the second paragraph -- or third, I guess --

THE COURT: "I'm providing you with the transcripts."

MS. SINGER: "If you want the transcripts."

MR. YONAN: I see.

THE COURT: So are you planning to send the transcripts to the jury with the recorded version?

MS. SINGER: We have no objection to the transcripts being sent with the recordings. And, therefore, I think the bracketed paragraph actually would stay, but the -- I guess the last sentence of the entire instruction would be --

(Counsel conferring.)

MS. SINGER: Sorry?

MR. YONAN: Sorry. I was talking to my co-counsel. I apologize.

MS. SINGER: No, that's all right.

MR. YONAN: We would be fine, your Honor, with the transcripts going back. That would be fine with us.

THE COURT: So that means we take out the second paragraph, right?

MS. SINGER: I think we would --

THE COURT: Or maybe not.

MS. SINGER: I think not the whole thing --

(Counsel conferring.)

THE COURT: You --

MS. SINGER: I think it would read for that, "I am providing you with the recordings and a device with instructions on its use. It's up to you to decide whether to listen to the recordings during your deliberations. You may, if you wish, rely on recollections of what you heard during the trial."

THE COURT: Right.

MS. SINGER: But after that would be --

THE COURT: Taken out.

MS. SINGER: -- taken out.

THE COURT: And then when -- in the -- after the opening sentences, "You were also given a transcript to help you follow the recordings." That means during the trial. So

we keep that in.

MS. SINGER:  Okay.

THE COURT:  Let's say "shown."

"Shown a transcript."

Okay.  Is everybody satisfied with Government No. 20? Is there any ambiguity in that?  "To carry out the crime," at the end of the sentence?

MS. SINGER:  I'm on 19, sorry.

THE COURT:  "Carry out the murder"?

MS. SINGER:  The defense would propose "to carry out the murder-for-hire."  For clarity.  Then we're not talking about something else at this point.

THE COURT:  Well, also like the crime, "carry out the crime of committing" --

MS. SINGER:  Right.  Either way.

THE COURT:  Yes.

MS. SINGER:  But I think some -- it should somehow reference the actual --

THE COURT:  Yes, crime.

MR. YONAN:  No objection from the government, your Honor.

THE COURT:  Okay.  So it would be "the crime" -- or -- I would -- I think it means to carry out the murder, doesn't it?

(Counsel conferring.)

MR. YONAN: I think it would be "carry out the murder-for-hire crime." That's how I would say it.

MS. SINGER: "Murder-for-hire crime"?

MR. YONAN: "Carry out the murder-for-hire."

THE COURT: Okay. Oh, well, I mean, we can --

MS. SINGER: I'm fine with that --

THE COURT: -- get into the weeds here, but -- "Takes a substantial step towards committing murder-for-hire with the intent to commit murder-for-hire. The substantial step must be an act that strongly corroborates" -- okay, "the defendant intended to commit murder-for-hire."

I'm happy with that if you are.

MR. YONAN: That would be fine with the government.

THE COURT: Okay. So that's all I had that hasn't been covered.

So tomorrow we'll have closings. Who is doing the closing for -- the opening closing?

MR. YONAN: I would be doing the opening closing, your Honor.

THE COURT: Okay. And then Mr. Shin for the closing closing.

MR. SHIN: Yes. Yes, your Honor.

THE COURT: Okay. And for the --

MS. SINGER: I'll be closing, Judge.

THE COURT: Okay. Anything else we need to talk

about?

MR. YONAN:  Not from the government, your Honor.  Thank you.

MS. SINGER:  Not from us.

THE COURT:  Okay.

MS. SINGER:  Thanks, Judge.

THE COURT:  Have a good evening.

MULTIPLE SPEAKERS:  Thank you.

THE CLERK:  All rise.  Court is adjourned.

(Adjourned at 4:07 p.m., until 1/22/26 at 9:30 a.m.)

* * * * *

We certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.


*/s/ NANCY L. BISTANY*_____                    *January 25, 2026*
NANCY L. BISTANY, CSR, RPR, FCRR
Official Court Reporter


*/s/ KELLY M. FITZGERALD*_____                 *January 25, 2026*
KELLY M. FITZGERALD, CSR, RMR, CRR
Official Court Reporter


*/s/ GAYLE A. McGUIGAN*_____                   *January 25, 2026*
GAYLE A. McGUIGAN, CSR, RMR, CRR
Official Court Reporter

I N D E X

                                              PAGE

Opening Statement by Mr. Shin                    9
Opening Statement by Mr. Bedi                   16




WITNESS                                        PAGE

ADRIAN JIMENEZ
     Direct By Mr. Shin                          22
     Cross By Ms. Singer                         53
     Redirect By Mr. Shin                        62


CHRISTOPHER PERUGINI
     Direct By Mr. Yonan                         64
     Cross By Mr. Bedi                           88
     Redirect By Mr. Yonan                      100


DONALD ADAMS
     Direct By Mr. Yonan                        103
     Cross By Mr. Bedi                          130
     Redirect By Mr. Yonan                      137


OSCAR ESPINOZA
     Direct By Mr. Bedi                         142
     Cross By Mr. Shin                          153
     Redirect By Mr. Bedi                       163

E X H I B I T S

NUMBER                                                    RECEIVED

Government's Exhibit

    No. 202                                                 26
    Nos. 201, 201T                                          28
    Nos. 204, 204T, 205                                     36
    Nos. 101-1, 101-2A, 101-2B, 101-2C, 101-2D
    101-2E, 101-2F, 101-2G                                  68
    No. 203                                                 43
    No. 501                                                 75
    No. 502                                                 77
    No. 301                                                 79
    No. 302                                                 80
    No. 303                                                 82
    Nos. 501-A, 501-B, 501-C                                84
    No. 402                                                107
    No. 402T                                               107
    No. 404T                                               112
    No. 405                                                114
    No. 601                                                116
    No. 604, 604T                                          118
    No. 605                                                120
    No. 605T                                               121
    Nos. 607, 607T                                         122
    No. 608, 608T                                          124
    No. 609, 609T                                          128